**Vernon L. HYSAW, Jr.; Niels Chapman, Jr.; Eugene Battle; Randy Craven, & Tony McDonald, Plaintiffs,**

v.

**WASHBURN UNIVERSITY OF TOPEKA; John L. Green; Jerry Robertson; and, Larry Elliott, Defendants.**

Civ. A. No. 86–2394–S.

United States District Court, D. Kansas.

Dec. 4, 1987.

Fred W. Phelps, Phelps—Chartered, Topeka, Kan., for plaintiffs.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, Kan., Barry E. Warren, Wallace, Saunders, Austin, Brown and Enochs, Chtd., Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' motions for summary judgment and for oral argument and plaintiffs' motion for sanctions. This civil rights and breach of contract case arises out of a dispute early in Washburn University's 1986 football season. Several black football players complained that they were being treated in a racially-discriminatory manner by the coaching staff and administration. The dispute culminated in those players boycotting team practices and the administration removing those players from the team. The players now claim defendants infringed upon their free speech, liberty and property rights in violation of 42 U.S.C. § 1983, violated 42 U.S.C. § 1981, and breached their contracts with Washburn University. Defendants ask for summary judgment on all of plaintiffs' claims.

The court has reviewed the uncontroverted facts submitted by defendants, plaintiffs' responses to them, and supporting documents and deposition testimony, and has determined that for purposes of this motion, the uncontroverted facts are as follows.

1. Plaintiffs are all black Americans recruited to play football for Washburn University.

2. Defendant John L. Green is the president of defendant Washburn University.

3. Defendant Jerry Robertson is the Athletic Director at defendant Washburn University.

4. Defendant Larry Elliott is the head football coach at defendant Washburn University.

5. Each of the plaintiffs were awarded football scholarships for the 1986–87 school year. Plaintiffs Neils Chapman ("Chapman"), Vernon Hysaw ("Hysaw"), and Eugene Battle ("Battle") were told they would receive scholarships to cover tuition, fees, books, room and board. Plaintiff Randy Craven received a scholarship to cover tuition, fees and books; a federally-funded Pell Grant was to cover the cost of his room and board. Plaintiff Tony McDonald also was to receive a scholarship sufficient to cover tuition, fees and books, with a Pell Grant to pay for his room and board.

6. Before receiving their scholarships, each of the plaintiffs executed an agreement indicating that they accepted the financial aid awards. The written agreements did not promise that the plaintiffs would be allowed to play football for Washburn.

7. Early in the 1986 football season, several black football players on the Washburn team began expressing discontent with their scholarships. They complained that promises of full scholarships had not been carried out; many also felt that white players on the team were being favored by the coaching staff and that lesser white players had been awarded better scholarships than some of the black players.

8. On August 26, 1986, several of the black players, along with the president of the Washburn Black Student Alliance (B.S.A.), met with defendants Green and Robertson about their concerns. The following day, the players met with defendant Elliott and with financial aid officials.

9. After those meetings, the B.S.A. president composed a letter to defendant Green outlining the concerns of the black players.

10. The players again met with the B.S.A. president after football practice on August 27, 1986. At that meeting, they decided that they were not satisfied with the administration's response to their complaints. To protest the administration's re-

sponse, the players agreed to boycott team practice.

11. The players prepared a letter containing a list of those players who would be boycotting; the letter indicated that the boycott was due to their dissatisfaction with the administration's response to their complaints.

12. On August 28, 1986, the players did not attend team practice.

13. On August 29, 1986, defendant Robertson responded to the players' boycott; he outlined the administration's position on their complaints. He also indicated that "missing practice without an excuse from the coaching staff is a violation of disciplinary rules affecting all players and will be treated in the same manner as any player's unexcused absence."

14. The players voted on August 29, 1986 to continue their boycott of practice and positional meetings.

15. Several additional meetings were held between the players and the administration. Some players were subsequently allowed to rejoin the team by meeting certain conditions set out by the administration.

16. On September 1, 1986, defendant Robertson met with the plaintiffs. Robertson told them that they would be allowed to retain their scholarships if they met the following conditions: 1) issue an apology through the news media to Washburn and its administration, 2) apologize to the football team at a team meeting, 3) participate in five early morning practices, 4) agree to be kept out of the first game that season, and 5) "exhibit total committment [sic] and support to the Washburn University football program."

17. Plaintiffs refused to comply with the administration's requests.

18. Defendants then refused to allow plaintiffs to return to the team.

19. Defendants claim that the reasons plaintiffs were not allowed to return to the team were that they had missed practice and positional meetings and had failed to show leadership. Plaintiffs claim they were not allowed to return because they boycotted in protest of the alleged racial mistreatment of black football players at Washburn.

20. All plaintiffs received the financial aid allocations promised them for the 1986–87 school year.

21. Plaintiffs filed this suit on September 3, 1986.

The court has determined that oral argument would not be of material assistance in the determination of this matter. Rule 15(d), Rules of Practice of the United States District Court for the District of Kansas. It will, therefore, proceed to dispose of the motions on the briefs.

A moving party is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The language of Rule 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

The court will address each of the plaintiffs' claims accordingly.

## I. Violations of 42 U.S.C. § 1981

■ Defendants argue summary judgment is in order on plaintiffs' section 1981 claims because plaintiffs had no contractual interest in playing football for Washburn University. The facts do establish that defendants complied with their obligations under the written contracts; see Section III, *infra*. Therefore, there can be no violation of section 1981 with regard to any claims plaintiffs have that they were denied scholarship monies awarded under the 1986–87 agreements or prevented from playing football as allegedly promised by their contracts. However, a review of the Pre-trial Order in this case indicates that plaintiffs' section 1981 claims go far beyond the issue of whether defendants breached the 1986–87 written scholarship agreements. They claim that throughout their playing careers at Washburn, white players with equal or less ability were given greater opportunities to make more beneficial scholarship contracts and were allowed greater opportunities to participate in the Washburn football program. If proven, these actions might constitute violations of 42 U.S.C. § 1981. While the court does not express any opinion concerning the merits of this claim, it is unable to grant summary judgment at the present time because defendants have not addressed plaintiffs' claim in full. The court would welcome an additional summary judgment motion on the merits of plaintiffs' 42 U.S.C. § 1981 claims in the future if the defendants wish to file one.

## II. Violations of 42 U.S.C. § 1983

Plaintiffs claim defendants infringed on their property, liberty, and free speech rights in violation of 42 U.S.C. § 1983. The court will grant partial summary judgment in favor of defendants.

### A. Property Rights

■ Plaintiffs first argue that defendants violated their property rights without affording them due process. They argue they held a property interest in contractual rights to play football for Washburn, and argue that by breaching their scholarship contracts the defendants have deprived them of a property right without due process.

Our analysis begins with *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth,* the United States Supreme Court set out the standard for determining whether an alleged deprivation of a property right violated due process. We must determine whether plaintiffs possessed a property right protected under the Constitution. Property rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Only after a protectable property interest has been established do we then determine whether due process was afforded.

Plaintiffs claim defendants deprived them of their contractual rights under the scholarship agreements to play football for Washburn University. However, plaintiffs have only established a property right in the scholarship funds. No deprivation of those funds took place; *see infra* Section III. Plaintiffs had no other protectable property interest. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiffs concede that the only source for their alleged property interest is their scholarship agreements. The court has determined that the only interests created by those agreements are interests in receiving scholarship funds. Any other terms plaintiffs attempt to read into those agreements are, without supporting evidence, no more than "unilateral expectations." The court

will therefore grant defendants' summary judgment motion on this claim.

### B. Liberty Interests

■ Plaintiffs Battle and Chapman next argue that defendants infringed upon their liberty interests in pursuing a college football career. This claim arises out of those plaintiffs' efforts to be recruited by the nearby Emporia State University football team after they were dismissed from the Washburn team. The additional uncontroverted facts for purposes of this portion of the motion are as follows.

1. After they were dismissed from the Washburn team, plaintiffs Battle and Chapman sought recruitment by the Emporia State University football team.

2. The head coach at Emporia spoke with defendant Elliott about the two plaintiffs.

3. Defendant Elliott commented to the Emporia coach about the plaintiffs' failure to attend practice and positional meetings. He allegedly told the coach the plaintiffs were lazy and were troublemakers.

4. Based on this information, the Emporia coach did not recruit Battle and Chapman.

Again, the court must start its analysis with *Board of Regents v. Roth.* A due process claim is made out only if the liberty interest allegedly violated is protectable under the Constitution. Again we look to an independent source of law to determine whether plaintiffs held a legitimate interest in the right to pursue a college football career. Only if this right is a protected liberty right under state law have plaintiffs made out a Section 1983 violation.

The plaintiffs concede that no right to pursue a college football career exists under well-established Tenth Circuit law. *See, e.g., Colorado Seminary (Univ. of Denver) v. NCAA,* 570 F.2d 320, 321 (10th Cir.1978) (interest of student athlete in participating in intercollegiate sports did not rise to level of constitutionally protected right invoking due process); *see also Justice v. NCAA,* 577 F.Supp. 356, 366 (D.Ariz. 1983) (participation in intercollegiate athlet-

ics is not a constitutionally protected interest). Furthermore, the court rejects plaintiffs' contention that the rule of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed. 2d 405 (1976), commands a denial of summary judgment here. The Court in *Paul* held that damage to an individual's reputation by a state official is not enough to establish a due process violation. Something more must be shown; a tangible interest must be established. *Paul,* 424 U.S. at 709–10, 96 S.Ct. at 1164–65.

The court finds no tangible interest here. *Roth* held that defamatory comments made by a government employer which cast a cloud over an employee's future employment prospects could constitute a deprivation of liberty. Plaintiffs now ask this court to extend the holding in *Roth* to the present situation; in effect, they are asking the court to equate government employment with a football scholarship. The court is unwilling to take such a giant leap. While no constitutional right to a government job exists, the Supreme Court has noted that qualification for a government job is a "privileg[e] of first-class citizenship." *Anti–Fascist Committee v. McGrath,* 341 U.S. 123, 183, 71 S.Ct. 624, 654, 95 L.Ed. 817 (1950) (J. Douglas, concurring). Plaintiffs have offered no reason why a right to pursue a collegiate athletic career should be afforded the same status, and the court likewise sees no reason to do so.

■ If plaintiffs have made out any claim here, it is one for defamation under Kansas law. The rule in *Paul* dictates that every violation of state tort law does not rise to a violation of section 1983 when committed by a state official. 424 U.S. at 700–01, 96 S.Ct. at 1160–61. Even claims of defamation are not enough, standing alone, to invoke the protections of section 1983. *Id.* at 701, 96 S.Ct. at 1161. Plaintiffs have shown nothing in addition to their defamation charges which would justify invoking section 1983, and defendants' motion on this issue will be granted.

### C. Free Speech Interests

■ Plaintiffs next claim that defendants violated their first amendment right to

free speech by removing them from the team after they protested racial mistreatment. Defendants first argue summary judgment is appropriate because the players were removed from the team simply for missing practices and a positional meeting. They allege the discharge had nothing to do with the players' protest, and they point to the team policy that unexcused absences from team practices or positional meetings may result in disciplinary action, including dismissal from the team.

However, plaintiffs point out that in defendant Elliott's deposition, he admitted that if a player were to miss practice in protest of racial mistreatment, the absence would be excused. If this were the case, then plaintiffs absences may have been excused, and defendants' reasons for dismissing the players would be inadequate. If the facts were to establish that the plaintiffs were disciplined for protesting racial mistreatment, defendants may have infringed upon plaintiffs' first amendment rights. Summary judgment would therefore be inappropriate.

Defendants next argue that even if the plaintiffs were dismissed for protesting racial mistreatment, the dismissal was justified as a reasonable time, place, and manner restriction. They cite *Tinker v. Des Moines Independent School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968), for the proposition that a school may prohibit first amendment activity by students if that activity "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Id.* at 509, 89 S.Ct. at 738 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)). Defendants argue that the boycott severely disrupted the football team and infringed upon the rights of others participating in the football program.

The court does not agree. It stretches the imagination to envision how an absence allegedly sanctioned by the coaching staff could be disruptive. Elliott testified that an absence protesting racial mistreatment would be excused. If the disputed facts bear out the fact that this was the policy, then the court should not grant summary

judgment. To do so would be to hold that the coaching staff followed a policy—excusing the players to protest—which caused disruption to the team. Such a ruling defies common sense.

Nor will the court hold that the alleged policy infringed upon the rights of others. At least one court has held that the *Tinker* exception is a narrow one. In *Kuhlmeier v. Hazelwood School Dist.*, 795 F.2d 1368 (8th Cir.1986), the court held that the rule of *Tinker* allowing restrictions on activity which invaded others' rights was meant to apply only to activity which could result in tort liability for the school. *Kuhlmeier*, 795 F.2d at 1376. While the *Kuhlmeier* case only provides guidance, we think its reasoning is sound, and we agree that the *Tinker* exception is a narrow one. The court is not prepared to hold that plaintiffs' actions infringed upon the "rights" of the other players. The boycott may have made practice more difficult, the team's morale may have been dampened by the plaintiffs' actions, and the season's play may have suffered. But the team's "rights" were not infringed upon, at least not under the narrow definition of "rights" spelled out in *Tinker*. The court will not place the interests of participants in a university extracurricular activity above the rights of any citizen to speak out against alleged racial injustice without fear of government retribution. The motion for summary judgment will be denied on this issue.

### III. Breach of Contract

■ Plaintiffs finally claim that defendants breached their scholarship contracts. Defendants argue that summary judgment is in order, because the only promise made in those contracts was to pay plaintiffs their scholarship money, and this was done. No other promises were made.

The law in Kansas is well-established that when a written contract exists and its language is clear and unambiguous, the language controls. *Fast v. Kahan*, 260 Kan. 682, 684, 481 P.2d 958, 961 (1971). Plaintiffs argue they were promised that they would be allowed to play football during the 1986–87 season. Yet the written

scholarship contracts they signed make no indication of such promises. In fact, the only promises in those written contracts were that the players would receive money. Plaintiffs provide no other evidence, other than "understandings" and "expectations", that they were promised a position on the 1986 team.

We then turn to the written language of the scholarship agreement to ascertain whether defendants breached those terms. The court finds that defendants met all obligations under the contracts. They promised to pay Chapman, Hysaw and Battle "full" scholarships for the 1986–87 school year, and Craven and McDonald were to receive "partial" scholarships. Plaintiffs concede that they received all disbursements on time. Defendants therefore met all their obligations under the contracts.

The court rejects the assertion that defendants' threats on September 1, 1986, constituted a breach of their scholarship agreements. They argue that any disbursements made after September 3, 1986, when suit was filed, only constitute mitigation of damages. However, the evidence does not indicate that the administration announced on September 1, 1986, "We hereby revoke your scholarships." Plaintiff has only shown the court that on September 1, defendants threatened to pull the scholarships. The evidence also indicates that the administration chose not to follow through with that threat, and instead paid all amounts promised. Whether the administration chose to comply with the agreement because of the suit the players had filed or for any other reason, their motivation is not controlling. The facts plainly indicate that all terms of the scholarship contracts were met, and plaintiffs concede this point. No breach of contract occurred, and summary judgment will be granted.

IV. Motion for Rule 11 Sanctions

Plaintiffs ask this court to assess sanctions against defendants, pursuant to Rule 11 of the Federal Rules of Civil Procedure, because the motion for summary judgment was frivolous and not supported by existing law. Since the court has found merit in some of defendants' arguments sufficient to justify partial summary judgment, sanctions would not be proper. Furthermore, while summary judgment is not justified on the remaining claims, defendants' arguments were not so frivolous that Rule 11 sanctions would be justified. The motion will be denied.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted in favor of the defendants on plaintiffs' claims of property and liberty deprivation under 42 U.S.C. 1983 and on plaintiffs' claims of breach of contract. Summary judgment is denied on plaintiffs' claims under 42 U.S.C. § 1981 and for first amendment violations under 42 U.S.C. § 1983. IT IS FURTHER ORDERED that defendants' motion for oral argument is denied. IT IS FURTHER ORDERED that plaintiffs' motion for Rule 11 sanctions is denied.