**Michael LESSER, Plaintiff,**

v.

**NEOSHO COUNTY COMMUNITY COLLEGE and Steve Murry, Defendants.**

**No. 89–4003–S.**

United States District Court, D. Kansas.

June 4, 1990.

**856**

Charles T. Engel, Timothy H. Girard, Cosgrove, Webb & Oman, Topeka, Kan., for plaintiff.

Ron D. Martinek, William A. Larson, Gehrt & Roberts, Chtd., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' motion for summary judgment on each of plaintiff's claims. This case arises out of plaintiff's experiences with the baseball program while attending defendant Neosho County Community College ("NCCC") and with defendant Steve Murry ("Murry"), coach of the NCCC baseball program. Plaintiff asserts claims of deprivation of liberty and property rights without due process of law in violation of the Fourteenth Amendment pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiff also asserts state pendent claims of fraud by silence, intentional misrepresentation, breach of contract, assault, and battery.

The following facts have been established for the purpose of the pending motion.

1. NCCC is a two-year community college located in Chanute, Kansas, and is a governmental subdivision of the state of Kansas.

2. NCCC offers the sport of baseball as one of its athletic programs. Defendant Murry has been the head baseball coach and a recruiter of NCCC since 1986.

3. In the fall of 1987, Murry, in his capacity as head baseball coach and recruiter, sent Mike Lesser a letter dated November 19, 1987, inquiring whether Lesser would be interested in going to school and playing baseball at NCCC.

4. On February 3, 1988, Murry again wrote to plaintiff and inquired about plaintiff's interest in visiting the NCCC campus. In the correspondence sent to plaintiff, Murry enclosed a questionnaire, a school brochure, and a flyer on the NCCC "Panther" Baseball program, which was written and edited by Murry.

5. The Panther baseball brochure made the following statements:

(a) "The Neo–Kan dormitory has co-ed living quarters.... You and your roommate will enjoy wall-to-wall carpeted rooms with individual study coves.";

(b) "The philosophy here is simple—my knowledge and your ability and hard work equal success in baseball, the classroom and in growing up. If you work for me, I will work for you.";

(c) "[The baseball coaching staff does] work hard and long to improve every phase of your game."; and

(d) "[The baseball coaching staff does] not recruit great athletics and just turn them loose."

6. In the spring of 1988, plaintiff made a visit to the NCCC campus. During this visit, plaintiff participated in a tryout where he threw between 10–50 pitches while being observed by Murry. Plaintiff was being recruited as pitcher and also tried out as an outfielder.

7. At the conclusion of the tryout, Murry offered plaintiff the opportunity to sign a Kansas Jayhawk Community College Conference ("KJCCC") letter of intent to attend NCCC.

8. The member institutions of the KJCCC are also members of the National

Junior College Athletic Association ("NJCAA".)

9. During plaintiff's first visit to NCCC, Murry advised plaintiff that the baseball team had a haircut policy and that plaintiff would need to get a haircut to participate in the baseball program. Also, plaintiff was advised that he would not be able to wear an earring while a member of the baseball team.

10. Murry never informed plaintiff prior to signing the letter of intent to attend and play baseball at NCCC that plaintiff could be eliminated from the program, or "cut," or that there would be cuts from the baseball team.

11. Murry cut players from the baseball team during the 1986–87 and 1987–88 seasons. Murry was aware that if Lesser was cut from the baseball team after attending classes at NCCC, plaintiff would be precluded from playing baseball at other NJCCC, NAIA or NCAA schools during the academic year.

12. Murry did not inform plaintiff prior to his signing the letter of intent of the baseball team's written and unwritten rules and monetary fine system to enforce the rules.

13. Before signing the letter of intent, plaintiff advised Murry that he would have to talk the matter over with his parents.

14. Plaintiff and his parents traveled to Chanute, Kansas, on or about April 29, 1988, so that plaintiff's parents could have an opportunity to see the campus. During this visit, Murry told plaintiff's parents that plaintiff would have to get a haircut in order to play ball at NCCC.

15. On April 29, 1988, plaintiff signed the KJCCC letter of intent to attend NCCC. Plaintiff's mother also signed the letter of intent. Under the terms of the letter of intent, NCCC agreed to award plaintiff a scholarship to cover the expenses of books and tuition for the spring semester and of books for the fall semester, if plaintiff met the admission requirements of NCCC. The letter of intent did not promise that plaintiff would be allowed to play baseball for NCCC or guarantee him a spot on the baseball team.

16. On August 16, 1988, plaintiff arrived in Chanute, Kansas, to begin attending NCCC. Prior to arriving at Chanute, plaintiff got a haircut. Upon his arrival, plaintiff checked in with Paul Marquez, a coach for the baseball team, to receive his room assignment in the school's dormitory.

17. Due to an overflow in the dormitory, the staff had to convert the central lobbies of each floor plus the recreation room into dormitory rooms. Plaintiff was assigned to the recreation room along with three other students, two of whom were baseball players. Although plaintiff and his mother were not happy with the situation, plaintiff did not complain because he did not want to "make waves." Therefore, plaintiff did not request reassignment to a different room.

18. Shortly after plaintiff's arrival at NCCC, other members of the baseball team told plaintiff he would need to cut his hair shorter in order to play on the team. Therefore, plaintiff consented to and received a crewcut style haircut from Dan Biby, a student assistant for the baseball team. Plaintiff got this haircut because he thought his hair was not short enough to comply with the team rules. This haircut was not at the direction of Coach Murry.

19. Plaintiff attended the first baseball meeting which was conducted by Murry. At this meeting, Murry passed out a written list of team rules. Murry indicated that these rules had been used in previous years by the team. In his deposition, Murry stated that the purpose of the team rules was to instill discipline and teach responsibility. Also, Murry indicated that some of the rules regarding player appearance were his personal preference as to the "team look." Murry also stated that there were certain unwritten rules and that he made up some rules as needed.

20. Also at the first meeting, Murry advised the players that in previous years the team had agreed to a one dollar fine or penalty for each violation of the team rules. The players voiced no objection to the continuation of the fine system. At

this time, Murry did not disclose the unwritten rules.

21. The fine money which was collected from the players for violating the rules was used to purchase equipment and items needed by the baseball team. The funds were deposited into a baseball team account in which Murry also deposited personal funds. Murry did not monitor the withdrawals from the team account.

22. Players were also advised that if they desired to contest the imposition of a fine, they would have to appeal the matter to the "kangaroo court." The "kangaroo court" was comprised of other members of the baseball team who apparently were chosen by Murry if an appeal of a fine was desired. If a player lost his appeal to the "kangaroo court," the rules stated that the fine would be doubled.

23. Also at the first meeting, Murry advised the players that due to the number of individuals on the team he would be making cuts to trim the roster. The cuts were to occur after four practices.

24. The first day of classes at NCCC was August 18, 1988.

25. Plaintiff participated in four practices while at NCCC. During these practices, plaintiff was assessed $4 in fines for violating four of the team rules. Plaintiff allegedly violated the written rule of not having a close shave. Plaintiff contends that he vocally contested the imposition of the fine for this violation. Also, plaintiff was fined for violating three unwritten rules: wearing a wrist bracelet, being in the wrong place at the wrong time, and not wearing a "cup."

26. Plaintiff paid the fines and did not attempt to appeal their imposition to the "kangaroo court." Plaintiff maintains that he did not know who comprised the court or to whom to appeal. Also, plaintiff states that he was under the impression that one could not successfully appeal fines to the "kangaroo court."

27. Dave Peter (Peter), an assistant coach for the baseball team, was in charge of evaluating the pitchers. In watching plaintiff's pitches, Peter was not impressed with plaintiff's speed or control. Peter gave plaintiff no personal instruction with regard to technique at any time. During the fourth practice, plaintiff threw approximately 50 pitches. During this time, Peter summoned Murry to watch plaintiff pitch. Murry concluded that plaintiff did not have a sufficient fast ball to help the team and did not have good control on his pitches. Peter recommended to Murry that plaintiff be one of the individuals cut from the team.

28. During one of the four practices, Murry initiated a "cup check." A cup is an athletic supporter reinforced usually with plastic to provide protection to the wearer's genitals. It was an unwritten rule that all NCCC baseball players were required to wear cups. Murry conducted the cup check to determine if each player was wearing a cup.

29. On the occasion in issue, Murry yelled "cup check" and second-year players began forming a line. Plaintiff fell in line with the rest of the players. Murry went down the line and tapped or hit the players in the genital area with a bat to determine if each player was wearing a cup. Plaintiff asked another player what was going on and the other player advised him that the coach was doing a cup check and if he was not wearing one, he should tell the coach and he would not be touched. As Murry approached plaintiff with the bat, plaintiff stepped back and said "I'll take the fine." Plaintiff states that his decision to step back was based on his fear that Murry was going to strike him in the genital area and his fear of pain. Murry assessed plaintiff a fine and did not strike plaintiff with the bat.

30. Plaintiff was one of the individuals that Murry cut from the baseball team on August 22, 1988.

31. Murry contacted Highland Community College ("HCC") in an effort to assist Mike Mitchell, another player that had been cut, in getting placed at HCC to play baseball. During the conversation, Murry also mentioned that plaintiff might be interested in attending HCC to play baseball. HCC is not a member of the KJCCC. Plaintiff did not go to HCC.

32. If plaintiff had not been cut from the NCCC baseball team, he would have received personal coaching attention and would have been advised with regard to improvements to his pitching technique.

33. While at NCCC, plaintiff did not have an opportunity to demonstrate his athletic skills to any collegiate or professional scouts.

34. At the time defendant Murry cut plaintiff from the team, plaintiff had begun attending classes at NCCC.

35. On August 22, 1988, plaintiff withdrew from NCCC. NCCC never attempted to withdraw plaintiff's scholarship for failure to make the baseball team.

36. On August 29, 1988, plaintiff enrolled at Iowa Western Community College ("Iowa Western") in Clarinda, Iowa. While at Iowa Western, plaintiff participated in the college's fall baseball program, but did not receive a scholarship. He pitched in approximately 12-15 games for Iowa Western and played shortstop in several games. Plaintiff completed 12 hours of class work at Iowa Western and compiled a 3.0 grade point average in the fall 1988 semester.

37. Plaintiff did not return to Iowa Western for the spring 1989 semester because he thought he was ineligible to play baseball for Iowa Western in the spring since he had not been released from his NCCC/KJCCC letter of intent. No representative of Iowa Western had advised plaintiff that he was ineligible because he had not been released from his letter of intent. Iowa Western is a member of the NJCAA but not the KJCCC. There is no rule or regulation of the NJCAA and KJCCC which requires Iowa Western to honor the NCCC letter of intent.

38. Plaintiff requested that NCCC release him from his letter of intent. On October 12, 1988, Ray Hames, athletic director of NCCC sent a letter to Bernie Lee, commissioner of the KJCCC, requesting an exception to the conference rule so that plaintiff could be released from his letter of intent and attend another conference. The commissioner ruled that there was no provision in the KJCCC bylaws which would allow a release of the letter of intent, and therefore, the request was denied. Commissioner Lee, however, did advise NCCC to look to the bylaws for procedures to appeal his decision, but NCCC did not prosecute an appeal. Plaintiff was never informed of the decision or the right to appeal.

39. NCCC did not release plaintiff from his letter of intent, although plaintiff had requested he be released. Also, NCCC did not lodge a written appeal of the KJCCC commissioner's decision denying the release of plaintiff's letter of intent.

40. In the spring semester of 1989, plaintiff enrolled at Emporia State University ("Emporia") and attended classes for three weeks before withdrawing. In the fall semester of 1989, plaintiff enrolled as a full-time student at Washburn University ("Washburn") and is presently attending Washburn.

41. Plaintiff inquired about Washburn's baseball program and playing for Washburn, but was advised by Steve Anson, coach of the baseball team, that plaintiff would not be eligible to play on the team until he completed 24 hours of class work at Washburn, since plaintiff had attended classes at Emporia in the spring of 1989.

42. At his deposition, plaintiff was asked whether knowledge of possible cuts prior to signing the letter of intent with NCCC would have made a difference in whether or not he would have signed the letter of intent. Plaintiff responded, "I don't know."

43. Also at his deposition, plaintiff was asked whether knowledge of the existence of a monetary fine system for violating team rules prior to his signing the letter of intent would have changed his decision to attend NCCC. Plaintiff responded, "I don't know."

44. On January 6, 1989, plaintiff filed this action alleging deprivation of certain constitutional rights and certain state tort and contract claims against defendants regarding his involvement in the baseball program at NCCC.

## I. SECTION 1983 CLAIMS OF DEPRIVATION OF CONSTITUTIONAL RIGHTS.

■ Plaintiff brings two claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983, claiming that he was deprived of a liberty interest and property interest without due process of law in violation of the Fourteenth Amendment of the United States Constitution. Initially, defendants argue that plaintiff lacks standing to assert these constitutional claims. The United States Supreme Court has set forth the general standards of required standing before a person can assert claims of constitutional deprivation. Plaintiff must allege that he has suffered some injury in fact, that the interests sought to be protected are arguably within the zone of interest to be protected by the constitutional guarantee in question, and that there is a fairly traceable causal connection between the alleged deprivation or injury and the challenged conduct of defendants. *Association of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 152, 153, 90 S.Ct. 827, 829, 829–30, 25 L.Ed.2d 184 (1970); *Duke Power Co. v. Carolina Env'l. Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); and *Citizens Concerned for Separation of Church and State v. City and County of Denver*, 628 F.2d 1289, 1295 (10th Cir.1980), *cert. denied* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). Also as an initial matter, defendants contend that since plaintiff acquiesced to and did not voice an objection to the team rules, he has waived any claims of deprivation of constitutional rights arising out of the team rules.

First, with regard to the claim of deprivation of liberty interest, the court does not need to address the issue of plaintiff's standing to assert this claim since the court will dispose of his liberty interest claim on the merits for reasons set forth below.

■ Next, with regard to plaintiff's claim of deprivation of property without due process, the court finds that plaintiff has standing to assert this claim. Plaintiff has alleged injury, in fact, in the form of economic loss since he claims he was deprived of his money. This alleged deprivation is fairly traceable to defendants' conduct in their administration of the fine system. The property interest sought to be protected by plaintiff is clearly within the zone of interest intended to be protected by the Fourteenth Amendment to the United States Constitution. Therefore, plaintiff has made the requisite showing of standing to assert his deprivation of property claim.

■ Finally, the court finds that although plaintiff, along with the other players, may have voluntarily agreed to abide by the fine system, plaintiff has presented sufficient facts to prevent the court from granting summary judgment on the property claim based on his alleged acquiescence to the fine system. Plaintiff has presented evidence that raises a conflict over whether the team actually voted on the use of the fine system. Moreover, the fact that a majority of the players may have voted for the system does not preclude any claims based on abridgement of constitutional rights. *See Grossberg v. Deusebio*, 380 F.Supp. 285, 288 (E.D.Va.1974) ("No vote of a majority of those participating can absolve conduct therein which abridges constitutional rights."); *Dawson v. Hillsborough County*, 322 F.Supp. 286, 300 (M.D.Fla.), *aff'd* 445 F.2d 308 (5th Cir. 1971). In addition, plaintiff has presented evidence raising issues about whether any alleged waiver of rights was made knowingly and voluntarily. Before a party can effectively waive any constitutional right, the waiver must be made knowingly and voluntarily. *See Ohio Bell Tel. Co. v. Public Utilities Comm'n*, 301 U.S. 292, 307, 57 S.Ct. 724, 731, 81 L.Ed. 1093 (1937); *D.H. Overmyer v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). In the present case, plaintiff has presented evidence that the fine system was not fully explained to the players and that the unwritten rules were not explained. The court finds that defendants have not shown plaintiff knowingly and voluntarily waived his claim of deprivation of property without due process.

### A. Deprivation of Liberty Interest Claims.

Plaintiff contends that by imposing rules limiting hair length, prohibiting facial hair, and restricting dress and appearance of the members of the NCCC baseball team, defendants violated plaintiff's constitutional right to determine his personal appearance and thus, deprived plaintiff of a liberty interest protected by the fourteenth amendment. Pretrial Order at 5.

In the present motion, defendants argue that plaintiff has no liberty interest in his personal appearance or hair style, and alternatively, argue that a rational basis existed for the grooming and personal appearance rules. The issue of whether individuals have a constitutionally protected liberty interest in their personal appearance and grooming has been the subject of some controversy since the Supreme Court's decision in *Kelly v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). *Kelly* involved a challenge to a regulation establishing hair grooming standards for a county's police force. In *Kelly*, the Court assumed without deciding that the citizenry at large has some sort of liberty interest under the Fourteenth Amendment in matters of personal appearance. *Kelly*, 425 U.S. at 244, 96 S.Ct. at 1444. Nevertheless, the Court upheld the grooming standard, finding that the challenged regulation was not arbitrary and was sufficiently related to rational justifications. *Id.* Since the *Kelly* decision, courts have assumed that there is a liberty interest in personal appearance without conclusively deciding the issue. *Cf. Grusendorf v. City of Oklahoma City*, 816 F.2d 539 (10th Cir.1987) (assuming a liberty interest in one's right to smoke when off work); *Miller v. U.S.D. No. 457, et al.*, No. 84–4203–R, slip op. at 5–6 (D.Kan., May 25, 1988) (discussing liberty interest in hair style.)

The cases cited by defendant finding no liberty interest or finding a school's personal appearance regulations rationally related to legitimate interest, such as instilling discipline, are all cases involving high school rules on the appearance of high school students. This court, however, finds that because plaintiff in the present case is an adult college student, his case is not controlled by these cases involving high school regulations of personal appearance. Case law indicates that liberty interests of adult college students are provided more protection than those of high school students. *See Lansdale v. Tyler Jr. College*, 470 F.2d 659, 663 (5th Cir.1972), *cert. denied* 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973); *Hander v. San Jacinto Jr. College*, 519 F.2d 273, 276 (5th Cir.1975.)

Although college students may have a generally recognized liberty interest in the control of their personal appearance, this court finds that no such interest is advanced under the particular facts this case. Unlike the *Lansdale* case, which involved a challenge to personal appearance regulations imposed on the entire student body of a college,[1] the rules challenged in the present case were applied only to those students choosing to participate in the baseball program at NCCC.

█ It is well established that participation in intercollegiate athletics is a privilege and not a right. *See Colorado Seminary (Univ. of Denver) v. NCAA*, 570 F.2d 320, 321 (10th Cir.1978) ("the interest of the student athletes in participating in intercollegiate sports [is] not constitutionally protected,. . . ."); *Parrish v. NCAA*, 506 F.2d 1028 (5th Cir.1975.) In *Parrish*, the Fifth Circuit stated that "[t]he privilege of participating in interscholastic athletics must be deemed to fall ... outside the protection of due process." *Parrish*, 506 F.2d at 1034. Further, it has been properly declared that:

> [e]ngaging in these activities is a privilege which may be claimed only in accordance with the standards set up for participation.

*NCAA v. Gillard*, 352 So.2d 1072, 1081 (Miss.1977) (quoting *Scott v. Kilpatrick*,

---

**1.** In *Lansdale*, plaintiff was not permitted to register to attend the Texas junior college because his hair length did not conform to the requirements of the college's "Dress Code," which regulated the appearance of all students attending the college.

286 Ala. 129, 237 So.2d 652 (1970)). The individual schools are in a better position to promulgate rules governing participation in their athletic programs than anyone else. *Gillard*, 352 So.2d at 1081.

■ This court finds that plaintiff has no fourteenth amendment due process right to participate in defendant NCCC's baseball program. We further find that plaintiff cannot claim a deprivation of liberty based on rules regulating those who choose to participate in this sport. The challenged rule applied only to those students wishing to participate in the baseball program. Compliance with the rules was not a requisite for attending the college, and was not applied to all students at the college. Therefore, defendants are entitled to summary judgment on plaintiff's due process claims of deprivation of liberty interest.

### B. Plaintiff's Claim of Deprivation of Property Without Due Process.

Plaintiff's deprivation of property claim arises from the fines imposed on him for alleged violations of baseball team rules. Plaintiff was assessed the total of $4 in fines for the alleged violations. Plaintiff claims that the imposition of the fines denied him of his constitutional right to due process. Pretrial Order at 6-7.

First, defendants argue that plaintiff cannot show any prejudice from the alleged deprivation of due process. In support of this contention, defendants argue that the fine system was agreed to by the players and that plaintiff did not object to the fines imposed. Defendants cite *Boster v. Philpot*, 645 F.Supp. 798, 804 (D.Kan.1986) as support. *Boster* involved the suspension of high school students after their involvement in vandalism to school property. The plaintiffs in *Boster* admitted their involvement in the vandalism. In *Boster*, Judge Kelly of this district found that any denial of due process to the plaintiff in that case did not result in substantial prejudice to the plaintiff since plaintiff had admitted his guilt.

Unlike the situation in *Boster*, plaintiff Lesser has stated that he did not admit to the violations of the team rules for which he was fined. Moreover, plaintiff contends that he directly contested the fine imposed for not having a close shave. The crucial fact for the court in *Boster* was that the plaintiffs in that case admitted their involvement in the school vandalism. Thus, the court found that even if they were deprived due process before being suspended from school, any such deprivation did not result in substantial prejudice to the plaintiffs since they admitted their guilt and involvement in the vandalism. *Boster*, 645 F.Supp. at 805. This court finds that since plaintiff Lesser has not admitted either the alleged violations or that he knowingly violated any rules, plaintiff has presented sufficient evidence that the alleged denial of due process resulted in prejudice to him to avoid summary judgment on this ground.

Next, defendants argue that sufficient appeals procedures were available to plaintiff and that by failing to avail himself of these procedures, plaintiff waived his right to due process. Defendants argue that plaintiff was aware of the "kangaroo court," but chose not to appeal the imposition of fines. Also, defendants argue that the student catalog set forth a student grievance process which was available to plaintiff. It is undisputed that plaintiff did not pursue his disputes regarding the imposed fines either to the "kangaroo court" or through the grievance procedure set forth in the school catalog.

Plaintiff has presented evidence that the members of the "kangaroo court" would apparently be selected by defendant Murry if a fine were appealed to that body. Also, there is evidence that no one knew who would comprise the "court" or to whom to appeal and that plaintiff was under the impression that an appeal to the "kangaroo court" would be futile. Finally, plaintiff contends that he was never made aware of the student grievance process or that it was available to him to appeal the fine. The court finds that plaintiff has presented evidence that the players were informed that the "kangaroo court" was their only avenue to appeal a fine.

The court finds that plaintiff has presented sufficient evidence to withstand summary judgment on his due process property claims.

## II. STATE PENDENT CLAIMS.

### A. Fraud by Concealment Claim.

Plaintiff contends that during his recruitment by defendants, defendants failed to inform him that he could be possibly cut from the baseball team, that he would be required to wear a military style haircut to be a member of the team, and that a system of monetary fines existed to enforce the team's written and unwritten rules. Plaintiff argues that he signed the letter of intent to play baseball at NCCC without ever having been apprised of these alleged material facts. Pretrial Order at 3.

To establish fraud by silence, the plaintiff must show by clear and convincing evidence the following elements: (1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff. *See Dushane v. Union Nat'l Bank*, 223 Kan. 755, 576 P.2d 674 (1978). A fact is material if it is one that a reasonable person would attach importance to in determining his choice of action. *Timi v. Prescott State Bank*, 220 Kan. 377, 389, 553 P.2d 315, 325 (1976).

In the present motion, defendants argue that the matters on which plaintiff bases his fraud by silence claim were disclosed to plaintiff and that they were not material facts as a matter of law. First, the court finds that plaintiff has failed to show evidence that would support a claim of fraud by silence regarding the haircut policy. The court finds that on at least two occasions prior to signing the letter of intent, plaintiff was informed by defendant Murry that the baseball team did have a haircut policy and that he would have to have a haircut before playing on the team. After arriving as a student at NCCC, plaintiff was never told by defendant Murry that he would have to obtain a "military style" haircut. Plaintiff obtained that impression from other sources.

Secondly, the court finds that plaintiff has failed to assert a claim of fraud by silence based on the fact that the possibility of being cut from the baseball team was not disclosed to him before signing the letter of intent. Plaintiff states that he read the letter of intent before signing the document. The letter of intent unambiguously put plaintiff on notice of the possibility of being cut from the team. The letter states in relevant part:

Both my parents/guardian and I understand that my failure to meet the admission requirements of the above-named institution, *but not my failure to make the team*, will render this agreement null and void. (Emphasis added.)

Therefore, the court finds that plaintiff cannot present evidence that defendants willfully or intentionally failed to disclose the fact that plaintiff could possibly be cut from the baseball team after signing the letter of intent.

Lastly, in regard to the claims of fraud by silence, defendants argue that the claim based on the failure to disclose the fact that monetary fines would be levied for violation of written and unwritten team rules is not a material fact since it would not have affected plaintiff's course of conduct in signing the letter of intent to play at NCCC. At his deposition, plaintiff testified that he did not know whether prior knowledge of the monetary fine system would have affected his decision to attend NCCC. Defendants contend that since plaintiff cannot establish as a fact that if the fine system had been known, he would have changed or altered his decision, the fact of the existence of the fine system was not material. The court finds that plaintiff has failed to present evidence that would

show that the existence of a monetary fine system for violation of team rules was a material fact in plaintiff's decision to attend and play baseball at NCCC. It has been stated that the failure to disclose facts which do not substantially affect the transaction are immaterial. 37 C.J.S. *Fraud*, § 18, at 253 (1943). There is no showing that prior knowledge of the existence of a fine system would have affected plaintiff's course of action in deciding to sign the letter of intent.

For all the foregoing reasons, the court will grant defendants' motion for summary judgment on plaintiff's claims of fraud by concealment or silence.

### B. Fraudulent Misrepresentation Claims.

Plaintiff also asserts a claim that defendant Murry made certain fraudulent misrepresentations. The alleged misrepresentations on which plaintiff bases this claim are: (1) that plaintiff would receive maximum exposure to major college and professional scouts while attending NCCC; (2) that NCCC would not recruit athletes and just turn them loose; (3) that NCCC's coaching staff would work long and hard to improve plaintiff's game; (4) that plaintiff would live in a two-person room at the dormitory; and (5) that NCCC's coaching staff would give plaintiff individual attention in developing his athletic ability. Pretrial Order at 4. These statements by defendant Murry to plaintiff were made in letter correspondence from Murry to plaintiff and in the brochure on the NCCC Panther Baseball program which was prepared by defendant Murry and sent to plaintiff.

 To recover on a claim of fraudulent misrepresentation under Kansas law, plaintiff must show that defendant made a representation or statement of material fact which was untrue and known to be untrue or recklessly made with disregard of its truth or falsity, on which plaintiff reasonably relied to his detriment. *See Goff v. American Sav. Assoc.*, 1 Kan. App.2d 75, 78, 561 P.2d 897, 901 (1977). A fact is material if it is one to which a reasonable person would attach importance in determining his choice of action in the involved transaction. *See Timi v. Prescott State Bank*, 220 Kan. 377, 389, 553 P.2d 315, 325 (1976). Also, reliance on the statements must be reasonable and justified. *See Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 467, 738 P.2d 1210, 1228 (1987) (citing *Hutchison Travel Agency v. McGregor*, 10 Kan.App.2d 461, 701 P.2d 977 (1985)).

 The court finds that plaintiff has presented sufficient evidence to create a triable issue concerning whether the challenged statements constitute fraudulent misrepresentations. Plaintiff has presented evidence that in previous years defendant Murry cut players he had recruited. Also, there is evidence that Murry knew that plaintiff might be cut from the baseball team when he made the allegedly fraudulent statements. Because plaintiff was cut from the team, plaintiff has shown that the did not receive exposure to college and professional scouts while at NCCC. There is evidence that he did not receive personal coaching attention from NCCC's coaching staff. Also, plaintiff presents evidence that he was not provided with a two-person dormitory room but instead had to share a converted recreation room with three other individuals. The court further finds that questions regarding whether defendant Murry intentionally deceived plaintiff or made these statements in reckless disregard to their truth or falsity; whether plaintiff justifiably relied on these statements; and whether plaintiff was damaged by any reliance on these statements are issues best left for the jury to decide in light of the circumstances of this case. Therefore, the court will deny defendants' motion for summary judgment on plaintiff's fraudulent misrepresentation claim.

### C. Breach of Contract Claim.

In his fifth cause of action, plaintiff seeks recovery based on defendants' alleged breach of contract. Plaintiff contends that the letter of intent he executed with defendant NCCC formed a contract, which provided that he would attend NCCC and play on the NCCC baseball team and in return he would receive a scholarship pay-

ing tuition, fees and books. Plaintiff maintains that his elimination from the baseball team was a material breach of that contract. Plaintiff further alleges that defendants failed to satisfy their duty of good faith under the contract by not prosecuting an appeal from the KJCCC commissioner's decision refusing to release plaintiff from his letter of intent. Pretrial Order at 5–6.

In their summary judgment motion, defendants argue that based on *Hyshaw v. Washburn Univ.*, 690 F.Supp. 940 (D.Kan. 1987), plaintiff's breach of contract claim must fail. Defendants argue that the letter of intent in no way promised plaintiff that he would be allowed to play baseball, but instead only promised him a scholarship. There is no dispute that defendants did provide plaintiff a scholarship.

■ The law of Kansas is well established that clear and unambiguous language in a written contract is controlling. *Fast v. Kahan*, 206 Kan. 682, 684, 481 P.2d 958, 961 (1971). This judge reviewed a very similar contract claim in the *Hyshaw* case. In *Hyshaw*, this court found that the letter of intent in that case only promised that the players would receive a scholarship and did not promise a position on the Washburn football team. *Hyshaw*, 690 F.Supp. at 946–47.

■ The written letter of intent in the present case is quite similar to the one in *Hyshaw*. The clear and unambiguous language of the present letter of intent only promised plaintiff that he would be awarded financial aid at NCCC to the extent of books and tuition for the spring semester and books for the fall semester. The letter of intent in no way promised plaintiff a position on the baseball team. The evidence presented shows that defendants met their obligations as set out in the letter of intent. Therefore, defendants' motion for summary judgment on plaintiff's breach of contract claim will be granted.

D. Plaintiff's Claim for Battery.

Plaintiff's battery claim is based on his contention that he was forced to submit, under duress, to having a military style haircut. See Pretrial Order at 4–5. As a result of the haircut, plaintiff claims he suffered humiliation and emotional distress.

■ Battery is an unprivileged or unlawful touching or striking by one intending to cause a harmful or offensive contact or to create an imminent apprehension of such contact. *Restatement (Second) of Torts* § 13 (1965); 6 Am.Jur.2d *Assault and Battery* § 5, at 18 (1963). However, an individual may waive any right to complain of the conduct underlying a battery by consenting to that conduct. *See Charley v. Cameron*, 215 Kan. 750, 528 P.2d 1205, 1210–11 (1974). Any such consent, however, must be made knowingly and voluntarily. 6 Am.Jur.2d *Assault and Battery* § 155, at 130–31 (1963). The court finds that plaintiff consented to the haircut given by Dan Biby, a student assistant of the team. Plaintiff has failed to present sufficient evidence to raise a triable issue regarding his allegations that he submitted to the haircut under duress or without voluntarily consenting. There is no evidence that the haircut was given at the direction of defendant Murry or that Murry played any role in the haircut incident. Therefore, plaintiff's battery claim will be dismissed.

E. Plaintiff's Assault Claim.

Plaintiff's assault claim is based on the "cup check" incident that occurred during one of the four practices that he participated in while attending NCCC. Plaintiff contends that defendant Murry's administration of the "cup check" placed him in fear and apprehension of bodily harm.

■ An assault is an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm. No bodily contact is necessary. *Gomez v. Hug*, 7 Kan.App.2d 603, 606, 645 P.2d 916, 919 (1982). In their motion for summary judgment on this claim, defendants argue that since plaintiff was told by another player that by telling Murry that he was not wearing a cup and he would not be struck, plaintiff could not have been placed in apprehension of bodily harm. Plaintiff

testified that he did experience fear and apprehension of bodily harm and believed that Murry might strike him in the genital area during the "cup check." Plaintiff never felt secure that defendant Murry would not strike him in the genital area with the bat. The court finds that the issue of whether plaintiff was placed in immediate apprehension of bodily harm is a question of fact to be determined by the jury. *See Gomez*, 7 Kan.App.2d at 607, 645 P.2d at 919. Therefore, the court will deny defendants' motion for summary judgment on this claim.

### F. Kansas Tort Claims Act Issue.

■ Finally, defendants move for summary judgment on plaintiff's fraudulent misrepresentation claims arguing that defendants' conduct in recruiting, disciplining and cutting plaintiff from the team were discretionary functions, and thus, pursuant to the Kansas Tort Claims Act are not actionable claims against the defendants. In response, plaintiff argues statutory tort claims immunity is not available because defendants breached a legal duty to him by making fraudulent misrepresentations, and thus, the discretionary function immunity to tort claims is not applicable.

K.S.A. 75–6104 states that:

a governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from: ... (e) any claim based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the party of the governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved.

The question before this court is whether plaintiff's claims that defendants engaged in fraudulent misrepresentations can be characterized as performance or exercise of a discretionary function. After conducting its own research on this matter, the court has found no Kansas case law which has dealt with this issue. However, this court has found a decision by the Supreme Court of Oregon which dealt with this very issue

in a very similar case. In *Dizick v. Umpqua Community College*, 287 Or. 303, 599 P.2d 444 (1979), the Oregon Supreme Court found that the discretionary function immunity from tort claims was not available to the government entity or its employee. Much like the Kansas Tort Claims Act, the Oregon Tort Claims Act provides that public bodies and their officers and employees are immune from tort claims based on the performance or the failure to exercise or perform a discretionary function. Or.Rev.Stat. § 30.265(3)(c). The plaintiff in *Dizick*, a student of defendant community college, asserted that the college misrepresented the courses and training that would be available to him if he decided to attend the college. The defendant college argued that the method of instruction, course content, recruiting, and counseling of students were all discretionary functions, and thus, it should be immune from liability on the student's claim. The Oregon Supreme Court held that the representatives of the community college were not exercising a discretionary function in falsely representing to the student that he would receive certain training and that certain equipment would be available for his use in obtaining the training. *Id.* at 308–310, 599 P.2d at 447. Therefore, the discretionary function immunity was not available to the defendant college.

This court agrees with the reasoning of the Oregon Supreme Court decision that fraudulent conduct, if proved, is not an exercise of discretion and does not involve policy making judgments. Furthermore, this court believes that a similar decision would be reached by the Kansas Supreme Court in interpreting the Kansas Tort Claims Act. Thus, the court rejects defendant's argument that the discretionary function exception to the Kansas Tort Claims Act applies to plaintiff's fraudulent misrepresentation claims.

IT IS BY THIS COURT THEREFORE ORDERED that defendants' motion for summary is granted in part and denied in part. Defendants' motion for summary judgment on plaintiff's claims of deprivation of liberty interest in violation of due

process, fraud by silence, battery, and breach of contract is granted. Defendants' motion for summary judgment on plaintiff's claims of deprivation of property in violation of due process, fraudulent misrepresentation, and assault is denied.