No. 45,899

Nora Ellen Fast, Vera Ellen Grubbs, Elsie Irene Horton, Carol Lee Unruh, Francis Edward Fast and Melvin Leroy Fast, *Appellees*, v. Louis Kahan, d/b/a S & K Oil Company, *Appellant*.

(481 P. 2d 958)

·Opinion filed March 6, 1971.

*W. Y. Chalfant,* of Branine & Chalfant, Hutchinson, argued the cause, and ·was on the brief for the appellant.

*Bill R. Cole,* of Weinlood, Cole, Oswalt & Shaffer, Hutchinson, argued the ·cause, and was on the brief for the appellees.

The opinion of the court was delivered by

O'Connor, J.: This is an action for the recovery of damages to crops and trees arising from defendant's oil operations on plaintiffs' land. After trial without a jury, the district court rendered a judgment in favor of plaintiffs, and defendant has appealed.

Two items of damages are the subject of controversy: (1) Loca-

tion and site damages for four oil wells drilled on plaintiffs' land, and (2) Loss of thirty-six trees in a shelter belt surrounding plaintiffs' farmstead caused by escaping salt water.

The evidence on the first item of damages is not in serious dispute. In the early 1950's defendant took over an existing oil and gas lease on plaintiffs' land, hereinafter referred to as the Fast lease. At the time, there were two producing oil wells on the property. Shortly thereafter, one of these wells ceased production. Defendant intended to drill several new wells, but before doing so, plaintiffs requested him to release the existing lease and take back a new lease in order to eliminate the outstanding mineral interests. On the advice of his attorney, defendant declined to comply with the request.

The lease under which defendant conducted his operations contained the following provision:

". . . Lessee shall pay for all damages caused by its operations to growing crops on said lands . . ."

In 1963 defendant proceeded to drill four wells on the east side of the Fast property, and paid plaintiffs the sum of $150 for each well as location and site damages. Written receipts executed by plaintiffs recited the payments were in full satisfaction and settlement of all rights and claims plaintiffs had for "damages to any lands or crops, fences, buildings or other improvements" resulting from the drilling of the specific wells. According to defendant, the basis of his paying the $600 for the four wells was that "the wells were drilled in the fall of the year and quite a bit of ground was torn up, and also due to the fact that he felt badly because he was unable to accommodate the Fasts in release of the old lease." All parties concede there was no express agreement or understanding at the time that defendant was to pay the sum of $150 per well for crop damages in the event additional wells were drilled.

One or two years later, defendant drilled four more wells on the west side of plaintiffs' property. Plaintiffs demanded $150 per well site as damages to growing crops on the theory that since defendant paid that sum for each of the first four locations he should pay a like amount for each of the last four wells. When defendant refused to pay, this action was instituted.

The trial court found that the written lease provisions quoted above had been modified by the conduct of the parties and awarded

plaintiffs $150 per well, or a total of $600. The essence of the lower court's holding was that the parties, by their acts, declarations and conduct, indicated a settlement figure of $150 per well site as damages for all future wells drilled on plaintiffs' land.

The decision of the lower court is challenged on the ground it is contrary to the law and the evidence. We are inclined to agree.

As we interpret the trial court's memorandum decision, the judge found the terms of the written lease ambiguous, and applied the rule that where ambiguous terms of a contract have been construed and acted on by the parties, such construction will be adopted even though the language used may more strongly suggest another construction. (See, *Rolander v. Sanderson,* 141 Kan. 809, 43 P. 2d 1061; *Mosher v. Kansas Coöp. Wheat Mkt. Ass'n,* 136 Kan. 269, 15 P. 2d 421; *Brick Co. v. Bailey.,* 76 Kan. 42, 90 Pac. 803.) While we have no quarrel with the rule as a general statement of law, it has no application here.

Ambiguity in a written instrument does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper one. (*Casey v. Aetna Casualty & Surety Co.,* 205 Kan. 495, 470 P. 2d 821; *Schnug v. Schnug,* 203 Kan. 380, 454 P. 2d 474.) The fallacy of the position taken by the court below is that the language of the written lease relating to the payment of crop damages is susceptible to only one possible interpretation. The provision in question is commonly found in oil and gas leases. It is plain, unambiguous, and means just what it says. Hence, there is no room for application of rules of construction. (*Shunga Plaza, Inc. v. American Employers' Ins. Co.,* 204 Kan. 790, 465 P. 2d 987.) A cardinal principle of contract law is that in the absence of fraud or mutual mistake, a clear and unambiguous contract must be enforced according to its terms. (*In re Estate of Johnson,* 202 Kan. 684, 452 P. 2d 286.)

It is well settled that the terms of a written contract may be varied, modified, waived, annulled or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in parol or in writing. (*Gibbs v. Erbert,* 198 Kan. 403, 424 P. 2d 276; *Bailey v. Norton,* 178 Kan. 104, 283 P. 2d 400.) One party to a contract cannot unilaterally change the terms thereof. Modification requires the assent of all the parties to the contract. Their mutual assent is as much a requisite in effecting

a modification as it is in the initial creation of a contract. Mutual assent may not only be shown by an express agreement, but also may be implied from the circumstances and conduct of the parties. In either case, however, there must be a meeting of the minds with respect to the proposed modification. (See, *Guy Pine, Inc. v. Chrysler Motors Corp.*, 201 Kan. 371, 440 P. 2d 595; *Hiniger v. Judy*, 194 Kan. 155, 398 P. 2d 305; *Ely v. Jones*, 101 Kan. 572, 168 Pac. 1102; 17 Am. Jur. 2d, Contracts § 465; 17A C. J. S., Contracts § 375.)

When measured by the foregoing principles of contract law, the evidence fails to establish a modification of the damage provision in the written lease. Certainly, there was no oral agreement or understanding that the payment of $150 per well by defendant was to be the measure of damages for all future well sites. The only evidence upon which plaintiffs rely to establish a modification by conduct of the parties is payment of the money by defendant. This act alone is not sufficient to imply mutual assent of the parties to the claimed modification. Defendant fully explained his reasons for making the payment. His explanation was consistent with the language of the written receipts executed by the parties. The most that can be said about the entire transaction is that the parties agreed the payment of $600 constituted a bona fide settlement of claims for the first four well sites. The payments, however, cannot be construed as a modification of the lease provision with respect to defendant's liability for damages in future drilling operations. There simply was no mutual assent or meeting of the minds beyond the transaction for which payments were made.

The cases relied on by plaintiff to sustain their position are not particularly helpful. None of them involved a contract provision relating to damages. Moreover, where a modification was found to have occurred, the parties had adopted a course of conduct to their mutual satisfaction different from that expressed in the original contract. For example, *Alexander v. Flick*, 154 Kan. 446, 119 P. 2d 464, was an action between two law partners for an accounting. The partnership contract provided in detail how annual settlements were to be made by the partners, but from the inception of the partnership the partners adopted another and wholly different means of settlement. This court held:

". . . [I]t is clear that the parties actually modified the contract as far as the accounting features were concerned. Courts should be slow to hold that written contracts have been modified by acts of the parties, but here there is no dispute as to what the parties did for 1936, 1937 and 1938. The modifica-

tion was made to their *mutual satisfaction.* We hold that the trial court should have followed the method of accounting that was followed by the parties, rather than that provided for in the contract." (p. 451.) (Emphasis added.)

We conclude that under the terms of the lease, defendant was liable for only actual damages to growing crops resulting from the drilling of the four wells in question. There having been no evidence of crop damages introduced, that portion of the district court's judgment cannot be sustained.

The second item of damages about which defendant complains pertains to the loss of thirty-six trees located on plaintiffs' land. The contention is made:

"The trial court erred in holding as a matter of law that Defendant was personally liable for the loss of 36 shelterbelt trees resulting from the overflow of salt water from a salt water disposal line owned by the North Burrton Salt Water Disposal Association, of which Defendant was only the operating agent."

The evidence discloses the North Burrton Salt Water Disposal Association, hereinafter referred to as the association, was organized in the late 1930's under the authority and regulations of the state corporation commission and department of health; that the association is composed of some thirty members, including the defendant; that nineteen of these members constitute an operating committee, and defendant is the operating agent of the association. The association owns and maintains salt water storage tanks, pipe lines and disposal wells throughout the Burrton field. The purpose of the association is to dispose of salt water from the 212 wells owned by the various members. Inasmuch as the Fast lease had always been a part of the association, defendant became an association member and the operating agent when he took over the lease. The association has one full-time employee whose job is to maintain the association's lines and equipment. In the event of a break in any of the disposal lines, the employee, with the help of defendant's employees, or outside workmen, makes the necessary repairs. The employee's salary, plus the wages of any of defendant's employees for the time chargeable to association work, is paid by defendant as operating agent and charged back to the association members who pay their proportionate share based upon their individual oil production.

The association had a salt water receiving tank located on the Fast lease from which water collected from defendant's wells was discharged into a line leading to the nearest disposal well. Early

in 1965, a leak developed in the line leading from the tank, permitting salt water to escape into a ditch alongside a shelterbelt protecting the farmstead on plaintiffs' property. The line, having broken on a prior occasion, had been repaired by the association's full-time employee in such a manner as to place a strain on it, causing it to break again. As a result, thirty-six Chinese Elm trees at one edge of the shelterbelt were destroyed.

The district court awarded damages in the sum of $450 for loss of the trees and held defendant personally liable, presumably, under the doctrine of *respondeat superior*. While we have considerable difficulty comprehending the theory of the lower court, we believe that its decision must be upheld.

The defendant, as a member of an unincorporated association, is individually liable for tortious acts committed by the association's agents acting within the scope of their employment. The rule is well stated in 7 C. J. S., Associations § 32c, P. 79.

"Although the mere fact of membership in an association is not of itself sufficient basis for a tort liability of individual members for the wrongful acts or omissions of an association or its agents, the members are responsible for tortious acts committed by the society, where it can fairly be assumed that they were within the scope of the purposes for which the organization was formed, or where they aided and abetted in the commission of the tort; and they are liable for torts committed by the association's agents, acting within the scope of their employment.

"Where liability exists, the liability of the members has been held several for the whole amount of damages incurred by a third party and not limited to a numerical or aliquot part thereof."

Also see, 6 Am. Jur. 2d, Associations and Clubs § 48.

Defendant strenuously urges that since he was acting only as operating agent of the association, the association itself was liable for the tortious ·act in question. Thus, he contends plaintiffs' proper remedy was to institute an action against the members collectively, or against one or more members as representatives of the class (K. S. A. 60-223 [*a*]; K. S. A. 1970 Supp. 60-223 [*b*]). The argument is procedural in nature and would have some validity had plaintiffs chosen to sue the association as such. (See, *Kansas Private Club Assn. v. Londerholm,* 196 Kan. 1, 408 P. 2d 891.) Here, however, defendant was sued as an individual, and liability, if any, must be predicated on his being a member of the association. Even in those states where statutes have been enacted permitting unincorporated associations to be sued *eo nomine,* it has generally

been held not to preclude a plaintiff from pursuing any remedy available to him at law or in equity against the individual members. (*Lyons v. Am. Legion Realty.*, 172 Ohio St. 331, 175 N. E. 2d 733, 92 A. L. R. 2d 492; Anno. 92 A. L. R. 2d 499.)

The record reveals that the tortious conduct of which plaintiffs complain was committed by the association's employee, acting within the scope of his employment and for the purposes for which the association was formed. Furthermore, as operator of the lease upon which the tort occurred and for whose benefit the association's employee was acting, defendant, in effect, had agreed to the course of action from which the wrongful act arose. Under all the facts and circumstances, defendant is severally liable as a member of the association for damages resulting from the escaping salt water from the association's disposal lines. That portion of the lower court's judgment is sustained, even though we believe it was arrived at through a process of erroneous reasoning. (See, *Paul v. Topeka Township Sewage District,* 199 Kan. 394, 430 P. 2d 228.)

An additional point is advanced about the measure of damages applied by the court in determining the value of the trees destroyed. After carefully examining the argument, we have concluded that defendant has not sustained his burden in affirmatively showing there was any error or irregularity prejudicially affecting his substantial rights. (See, *Phillips v. Fisher,* 205 Kan. 559, 470 P. 2d 761.)

That portion of the judgment awarding damages for the four well sites is reversed and the case remanded with directions to enter judgment for defendant; the judgment for damages for loss of trees is affirmed.