William J. MARSH, Plaintiff,

v.

COLEMAN COMPANY, INC., Defendant.

No. 90–1030–C.

United States District Court, D. Kansas.

Oct. 10, 1991.

Diane S. Worth, Dennis M. Feeney, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Daniel T. Brooks, Wichita, Kan., for plaintiff.

Gloria G. Flentje, Mikel L. Stout, Foulston & Siefkin, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion for partial summary judgment filed by defendant Coleman Company, Inc. Plaintiff, William J. Marsh ("Marsh"), alleges his termination from Coleman Company on or about January 20, 1988, was taken in connection with certain fraudulent misrepresentations, was in breach of an implied contract of employment, and was in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* Defendant seeks summary judgment on the plaintiff's two common-law claims, breach of an implied contract and fraud. Defendant's request for oral argument is denied as the parties have thoroughly researched the issues and fully presented their arguments in the memoranda filed with the court.

The court and the parties are well acquainted with the standards of summary judgment. For this reason, the court will dispense its formulation of those standards and go directly to the uncontroverted facts in this case. *See Guliford v. Beech Aircraft Corp.*, 768 F.Supp. 313, 315 (D.Kan. 1991).

During the relevant times of this lawsuit, Coleman Company was a corporation having an Outing Products Group, which manufactured various outdoor equipment, thermal products and marine products, and a Heating and Air Conditioning Group, which manufactured heating and air conditioning equipment for both manufactured and residential housing and other recreational housing. Plaintiff Marsh began his employment at Coleman Company on February 15, 1960, as a Junior Industrial Engineer in the Outing Products Group. After three years on the manufacturing side, plaintiff was moved over to design with some responsibilities for inventions. Months later on November 18, 1963, plaintiff entered into a written employment agreement with the Coleman Company.

This written contract first sets forth the consideration underlying the agreement and then begins:

1. Coleman agrees to and does hereby employ or continue to employ Employee, as the case may be, upon the general employment terms and conditions contemporaneously herewith agreed upon between the parties hereto, including but not limited to wages or salary. Coleman further agrees not to terminate Employ-

ee's said employment without just cause except upon thirty (30) days' written notice to Employee, and not to decrease Employee's wages or salary at any time during his said employment except upon two (2) weeks' prior notice. In consideration thereof, Employee agrees to and does hereby assign, transfer, and convey to Coleman, its successors, trustees, and assigns, his entire right, title, and interest in and to any and all inventions which have been or may be conceived or made by him, either solely or jointly with others, during his employment by Coleman, or any of its subsidiary or controlled companies, and which relate to outing products, camp stoves,....

The agreement goes on to obligate Coleman Company to prosecute any patent applications deemed worthy in Coleman Company's judgment. If a patent or invention happened to be sold or licensed for money consideration, Coleman Company agreed to pay a royalty to the employee(s) responsible for the work. The agreement provided that Coleman Company owed the royalties even after employment with the company ended. The agreement also addresses other issues relevant to patents and licenses on an employee's inventions. The agreement is silent concerning any term or duration and does not refer to the plaintiff as being employed in any particular position or capacity.

During his years at the Coleman Company plaintiff enjoyed several promotions and advancements. One of his highest achievements occurred in 1969, when plaintiff was made Director of Design Engineering for the Outing Products Group. He held that position until 1985 when he became Director of Manufacturing for the Manufactured Housing (Mobile Home) Division of the Heating and Air Conditioning Group.

Plaintiff's move in 1985 was due to several events. In 1984, Sheldon C. Coleman ("Sheldon Junior") became the General Manager for the Outing Products Group. Around the same time, the Outing Products Group was broken down into several divisions causing the question whether the employees of the Design Department would still have jobs. After the divisionali-

zation occurred, discussions between Sheldon Junior and plaintiff concluded that no positions remained for plaintiff in the new organization of the group. Sheldon Junior told plaintiff that a divisionalization was also occurring in the Heating and Air Conditioning Group and that he should contact Bob Hoffman, Manager of the Manufactured Housing Division of the Heating and Air Conditioning Group, about a position as Director of Manufacturing in the Mobile Home Division. Around this same time, plaintiff met with Sheldon Senior about the concerns of employees in the Design Department over the reorganization. Sheldon Senior told plaintiff to assure his employees that there would be jobs for everyone in his department after the divisionalization.

Plaintiff was interviewed and hired by Bob Hoffman for the position of Director of Manufacturing for the Mobile Home Division, effective January, 1985. Hoffman was Marsh's immediate supervisor. Don Berchtold headed up the entire Heating and Air Conditioning Group. In 1985, this group was divided into three divisions: Manufactured Housing (Mobile Homes), Residential, and Recreational Vehicles.

In February of 1985, the Outing Products Group held a party to honor the plaintiff. Sheldon Junior spoke to the Group praising Marsh's accomplishments in design. Marsh recalls that Sheldon Junior said, among other things, that "there will always be a place for Bill Marsh at the Coleman Company."

In May of 1987, Hoffman and Marsh transferred from the Manufactured Housing Division to the Residential Division of the Group. On January 2, 1988, Marsh received a memorandum sent to all weekly and monthly salaried employees from Berchtold dated December 31, 1987, stating that the Manufactured Housing Division and the Residential Division would be merged, explaining the business reasons for that decision, and naming the heads for the various combined departments. Joe Nold was designated to head up the manufacturing operation.

After January 2, 1988, plaintiff recalled having several conversations with Joe Nold. Nold told Marsh: "Don't worry, you're working for the world's nicest guy now; everything's going to be all right. And what I want you to do is just continue what you're doing and just sit back, relax, don't worry." Marsh also remembered Nold calling on another occasion and saying everything was fine and not to worry.

Nold's responsibility was to decide who was to remain in the combined division and to select a staff who would report directly to him. Nold decided to streamline the manufacturing operation and reduce the number of employees by twenty-nine. Nold and his staff considered each of existing manufacturing employees in both divisions for the remaining positions. Plaintiff was not selected by Nold for any of the positions. Nold's reason was that other employees had skills and abilities better suited for the particular positions required in the streamlined operation. Nold's decisions were reviewed by Sheldon Senior, Sheldon Junior and other corporate officers. In reviewing Nold's recommendation, defendant's officers could have considered plaintiff for positions in other divisions.

On January 20, 1988, Nold met with Marsh and told him that he was one of thirty people being let go as a result of the divisions combining.[1] At that time, Nold also went over Marsh's separation package which included regular pay through January 31, 1988, unused vacation pay, and then ten months severance pay at his current base salary. His group health insurance, dental insurance, basic life insurance, accidental death and dismemberment insurance and optional life insurance was also continued for the severance period. Following the ten months of severance pay, Marsh took early retirement with Coleman Company.

In his first deposition taken May 25, 1990, Marsh testified that he had a written employment agreement with Coleman Company that provided a thirty-day notice period before any termination unless it was for cause. Marsh explained that this agreement was breached when his termination took effect before the thirty days had passed.

In his second deposition taken January 31, 1991, plaintiff testified that his contract claim was also based on promises made to him by Sheldon Junior and Joe Nold. Plaintiff avers the reason for his change in testimony was that trial counsel retained after his first deposition explained to him that a contract can be implied; therefore, he did not realize the legal implications of these promises or assurances until then.

## FRAUD

As set forth in the "Issues" section of the pretrial order (Dk. 49 at 3), plaintiff alleges he was defrauded in one or more of the following particulars:

(1) by falsely representing through its agent, Sheldon C. Coleman (Sheldon Junior):

(a) there would be jobs available for everyone in the Design Group, including plaintiff;

(b) that employees in the Design Group need not be concerned about their jobs;

(c) that plaintiff would have permanent employment with defendant as long as there was a Coleman Company.

(2) by enticing plaintiff not to look for other employment as a result of the representations of Sheldon C. Coleman, which representations were relied upon by plaintiff and which representations caused plaintiff to forego seeking other job opportunities during the period 1984 until the date of his termination.

(3) by falsely representing through its agent, Sheldon Coleman (Sheldon Senior),

---

1. Plaintiff at page thirty-three of its response (Dk. 56) states: "Marsh denies that he was told he was being terminated as a result of the reorganization. Marsh testified that what Nold told him was 'We're getting rid of 30 people and you're one of them.' (Marsh Depo., p. 182, Appendix B–2)." Nothing on that page of Marsh's deposition sustains his denial that he was not told the reason for his termination. In fact, the court finds his deposition testimony to establish the contrary.

that there would be jobs for everyone in plaintiff's group.

(4) by expressly or impliedly approving the false statements of Sheldon C. Coleman, through its then president Sheldon Coleman (Senior).

(5) by falsely representing to plaintiff through its agent, Joe Nold, on numerous occasions, not to worry about his position in the company and that everything would be fine.

(6) by enticing the plaintiff over a period of years to believe that his position was permanently secure when, in fact, defendant had no intention of providing plaintiff job security.

Plaintiff did not allege a fraud claim in his original complaint filed January 19, 1990. On November 5, 1990, plaintiff moved for leave to amend his complaint to include claims for fraud and breach of an implied contract. Over defendant's opposition, the Magistrate granted this motion in an order filed December 24, 1990. (Dk. 31). The first amended complaint was filed December 31, 1990. (Dk. 32).

Defendant contends the fraud claim is barred by the statute of limitations and does not relate back to the filing of the original complaint. In the alternative, defendant argues the plaintiff is unable to prove the elements to his claims of fraudulent promises. Plaintiff responds that the fraud claims come within the terms of Fed. R.Civ.P. 15(c) and properly relate back to the original complaint and that the merits of his fraud claim cannot be decided without resolving questions of material fact.

■ Rule 15(c) provides in pertinent part: "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Rule 15(c) is built upon the premise that once notified of pending litigation over particular conduct or a certain transaction or occurrence, the defendant has been given all the notice required for purposes of the statute of limitations. *Baldwin County Welcome Center v. Brown,* 466 U.S. 147,

149 n. 3, 104 S.Ct. 1723, 1725 n. 3, 80 L.Ed.2d 196 (1984). The linchpin to Rule 15(c) is notice before the limitations period expires. *Schiavone v. Fortune,* 477 U.S. 21, 31, 106 S.Ct. 2379, 2385, 91 L.Ed.2d 18 (1986). Relation back does not offend the notice policies underlying a statute of limitations if the original complaint fairly discloses the general fact situation out of which the new claims arise. 3 James W. Moore & Richard D. Freer, *Moore's Federal Practice* ¶ 15.15[2] at 15–144, 145 (1985). Amendments will relate back if they only flesh out the factual details, change the legal theory, or add another claim arising out of the same transaction, occurrence or conduct. Moore, *supra,* at ¶ 15.15[2] at 15–148—15–151. Relation back is denied those amendments which are based on entirely different facts, transactions, and occurrences. *Holmes v. Greyhound Lines, Inc.,* 757 F.2d 1563, 1566 (5th Cir.1985).

■ Looking back at the plaintiff's original complaint, he limited his factual allegations to his termination on January 20, 1988, to the reasons given for his termination, to his replacement being younger, and to the defendant's actions being in breach of his employment contract. All alleged events occurred on January 20, 1988, or after. The complaint made no reference to any transactions or events occurring in 1984 or 1985. None of the claims were based on promises by defendant that plaintiff would always have employment with it. Not until his amended complaint, did plaintiff ever allege that defendant's agents made fraudulent statements to him prior to his discharge. For that matter, plaintiff never sought damages for lost employment opportunities until he added his new claim for fraud. The only factual overlap between plaintiff's fraud claim and his original claims is that his employment with defendant ended on January 20, 1988. Other than this, the claims are based on events and transactions that are distinct in time and not closely related. A reasonably prudent person would not have expected from reading the plaintiff's original complaint that promises made to plaintiff before termination, in par-

ticular those made more than three years earlier, might be called into question through subsequent pleadings. *See Rickman v. Cone Mills Corp.*, 129 F.R.D. 181, 186 (D.Kan.1990).[2]

The above conclusion is consistent with how other courts have applied Rule 15(c) in employment discharge or discrimination cases. Relation back is permitted when the amendments simply allege another unlawful motive for the same adverse employment action. *See, e.g., Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir.1983) (The amendment of race and sex discrimination claims, both of which had been the subject of an earlier EEOC charge, related back to an arbitrary dismissal complaint), *aff'd*, 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984); *Bernstein v. National Liberty Intern. Corp.*, 407 F.Supp. 709, 713–14 (E.D.Pa.1976) (Amending a sex discrimination claim to a Title VII case for religious discrimination "merely adds a new label...."). Another legal theory for why the same discharge was wrongful will also relate back. *See, e.g., Wong v. Calvin*, 87 F.R.D. 145, 150–51 (N.D.Fla.1980) (A due process claim based on the lack of a pretermination hearing to relate back to a Title VII discharge complaint). Courts have denied relation back when the amended claims are based on actions of the employer that are substantially different in kind or time. *See, e.g., Percy v. San Francisco General Hosp.*, 841 F.2d 975, 979 (9th Cir.1988) (A 42 U.S.C. § 1983 claim based on the plaintiff's post-discharge civil service commission hearing did not relate back to the Title VII claim for a racially motivated discharge); *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir.1980) (A 1968 discriminatory discharge claim did not relate back to the complaint alleging a discriminatory discharge only in 1971), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68

L.Ed.2d 304 (1981); *Barnes v. Callaghan & Co.*, 559 F.2d 1102 (7th Cir.1977) (A slander claim for publishing the alleged reasons for plaintiff's discharge did not relate back to the Title VII and contract claims for discharge).

Plaintiff's promissory fraud claims are based on conduct substantially different in kind and time from that alleged in plaintiff's original complaint. The crux of a promissory fraud claim is not that the promisor breached his promise to perform, rather it is that the promisor fraudulently represented his present intent to perform. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979). Defendant had no reason to anticipate from reading the plaintiff's original complaint that it should prepare to defend a case based on acts more than three years earlier. For these reasons, the court finds the plaintiff's fraud claim does not relate back to the filing of the original complaint and, therefore, is barred by the two-year statute of limitations, K.S.A. 60–513(a)(3).

■ Assuming the plaintiff's fraud claim had been timely brought, the court, nevertheless, would grant the defendant's motion on the alternative ground that plaintiff was not able to come forth with clear and convincing evidence for a reasonable jury to find in his favor on the elements of intent and reasonable reliance.

The first alleged fraudulent promise is the statement attributed to Sheldon Senior. This statement was not false as to plaintiff, since Marsh was employed in the Heating and Air Conditioning Group after the divisionalization in the Outing Products Group. Consequently, plaintiff was not injured in relying on this statement.

---

**2.** Plaintiff argues the defendant waived any challenge to the timeliness of his fraud claim by not appealing the Magistrate Judge's order granting plaintiff leave to amend. The court finds no merit to this argument. While the issue of futility raised in motions to amend may be the same or similar as the issues of merit raised in a later dispositive motion, the court is unaware of any waiver doctrine applying as argued by the plaintiff here. The reasons appear obvious. The party seeking amendment is not held to the same procedural requirements imposed on him when defending against a motion to dismiss or a motion for summary judgment. Most importantly, the court here did not refer this dispositive motion or any of its issues to the Magistrate Judge for decision.

■ The circumstances existing in February 1985 do not suggest that Sheldon Junior never intended to abide by his promise of lifetime employment. Giving the plaintiff the benefit of all reasonable inferences, the circumstantial evidence of fraudulent intent falls short of a clear and convincing standard. The fact that plaintiff was not terminated until nearly three years later substantially clouds any inference of fraudulent intent. Moreover, it is not reasonable for plaintiff to have relied on a single statement made during a speech honoring and praising his service and importance to the company. The remark itself, "there will always be a place for Bill Marsh at the Coleman Company," bespeaks of the embellishments and "puffing" associated with the celebrative spirit of honoring an employee. The substance and circumstances of this statement are not consistent with a genuine claim of promissory fraud.

The vague personal assurances of Joe Nold also fall short of actionable fraudulent promises. Though the comments may be subject to various interpretations, a promise of lifetime employment is not a reasonable one. Finally, the plaintiff has not shown any possible damages for the eighteen days, January 2, 1988, through January 20, 1988, that he delayed his job search. In fact, the receipt of severance pay for ten months ameliorated the economic hardships of his job search. Defendant is entitled to summary judgment on plaintiff's claim of promissory fraud.

## IMPLIED CONTRACT

Plaintiff alleges his termination was in breach of an implied contract. Specifically, the plaintiff contends in the pretrial order:

These actions of the defendant were not in accord with the employment agreement between William J. Marsh and the defendant that arose from the parties' course of conduct, the defendant's continued praise and advancement of William J. Marsh in the company, defendant's stated policy in its personnel manual, and defendant's direct representations through Sheldon C. Coleman, Joe Nold and Sheldon Coleman (Senior).

(Dk. 49 at 9). Defendant argues the plaintiff cannot pursue this claim because of the written employment agreement dated November 18, 1963. One of its provisions gives the defendant the right to terminate the plaintiff for any reason upon thirty days notice. Defendant argues the existence of this express agreement with this particular clause precludes any claim that an implied contract also existed with a term that plaintiff could only be terminated for cause. In response, plaintiff argues the written contract was no longer applicable after he left the Design Department where his responsibilities included inventing products. Even if applicable to his position in manufacturing, the written agreement, in plaintiff's opinion, was modified by subsequent statements and conduct.

■ The first question to decide is the enforceability of the written contract. Plaintiff's current position is that the 1963 contract became null and void after plaintiff left the Design Department.[3] Granted the contract primarily dealt with the assignment, patents, and licenses of the employee's inventions, there is still nothing in its terms or by the parties' conduct that suggests the contract was not effective in January of 1988. The contract did not limit itself to a specific term or to a particular type or kind of employment by plaintiff. In return for relinquishing his rights to inventions, the plaintiff was entitled to thirty-days notice before any termination without cause. The contract does not say it affects only those terminations from positions where the plaintiff has been responsible for inventions. In fact, defendant's consideration for the contract included payment of royalties even after plaintiff left Coleman, thereby indicating the contract

3. Plaintiff's original complaint included a claim for breach of contract. When asked at his deposition to explain the substance of this claim, plaintiff said the defendant failed to give him the thirty-day notice required in the 1963 contract. It appears the plaintiff has since abandoned that claim. Nonetheless, this deposition testimony is convincing evidence that the plaintiff considered the contract to govern his rights even after he left the design department.

was not tied or limited to a particular type or kind of employment. In this respect, the written agreement is unambiguous. The court finds as a matter of law that the written agreement was enforceable in January of 1988.

■ The next question is whether plaintiff can pursue an implied contract claim in the face of this written contract. In *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987), the Kansas Supreme Court not only traced the history to the traditional employment-at-will doctrine but recognized that certain developing exceptions have eroded its force. The exception adopted there, that is relevant here, is the implied contract theory. For the most part, the Kansas Supreme Court followed the general rule for implied contracts stated in Syllabus ¶ 5 of *Allegri v. Providence–St. Margaret Health Center*, 9 Kan.App.2d 659, 684 P.2d 1031 (1984):

> "Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

241 Kan. at 513, 738 P.2d 841. The court found that a material issue of fact existed over whether an implied contract existed by Coleman to treat its employees fairly and in good faith and to terminate an employee only for just cause. The evidence looked to was the personnel manuals, the conduct of supervisors, and established company policies. 241 Kan. at 513, 738 P.2d 841.

No mention is made in *Morriss* of an existing written contract of employment. In fact, Kansas courts have not decided whether an implied-in-fact employment contract claim can exist alongside a written employment contract.[4] Consequently, the parties have resorted to case law from other jurisdictions. The court is not so quick to stray from Kansas law for the issues here can be decided under fundamental contract law principles firmly rooted in Kansas.

"The general rule is that an express contract on a given subject matter, absent fraud or mutual mistake, excludes the possibility of an implied contract or covenant of a different or contradictory nature." *Duvanel v. Sinclair Refining Co.*, 170 Kan. 483, Syl. ¶ 1, 227 P.2d 88 (1951). The rationale is simple. Courts are not willing to undermine the parties' freedom to contract through written agreements by having those express terms readily substituted with others implied from either the parties' subsequent conduct or the law.

Like any general rule, there are exceptions. One is that custom or usage may be used to explain ambiguities in the instrument. *Havens v. Safeway Stores*, 235 Kan. 226, 231, 678 P.2d 625 (1984). But if the written contract is complete and clear, an additional term will not be implied. *Burge v. Frey*, 545 F.Supp. 1160, 1170 (D.Kan.1982). Plaintiff does not advance this exception.

Another exception is the modification of the existing agreement. The rules governing modification include:

> It is well settled that the terms of a written contract may be varied, modified, waived, annulled or wholly set aside by any subsequently executed contract, whether such subsequently executed con-

---

**4.** In *Konijnendijk, v. Deyoe*, 727 F.Supp. 1392 (D.Kan.1989), the plaintiff argued he had an implied contract of continued employment stemming from oral assurances made to him before he signed the written employment contract. Judge Rogers found the plaintiff's evidence of the implied contract inadmissible under the parol evidence rule. Even though Coleman Company does not argue the parol evidence rule should be applied here, the *Konijnendijk* is instructive for its use of traditional contract law principles in this employment contract setting.

tract be in parol or in writing. (citations omitted). One party to a contract cannot unilaterally change the terms thereof. Modification requires the assent of all the parties to the contract. Their mutual assent is as much a requisite in effecting a modification as it is in the initial creation of a contract. Mutual assent may not only be shown by an express agreement, but also may be implied from the circumstances and conduct of the parties. In either case, however, there must be a meeting of the minds with respect to the proposed modification. (citations omitted).

*Fast v. Kahan,* 206 Kan. 682, 684–85, 481 P.2d 958 (1971). The agreement to modify a contract must be supported by independent consideration. *Block v. Fedak,* 210 Kan. 63, 65, 499 P.2d 1052 (1972). "Courts should be slow to hold that written contracts have been modified by acts of the parties...." *Alexander v. Flick,* 154 Kan. 446, 451, 119 P.2d 464 (1941). Kansas courts have generally reserved modification to those circumstances where the parties "adopted a course of conduct to their mutual satisfaction different from that expressed in the original contract." *Fast,* 206 Kan. at 685, 481 P.2d 958. While written agreements may be modified by oral promises, the plaintiff must prove the same with clear and convincing evidence of an intent to modify the agreement. *EDO Corp. v. Beech Aircraft Corp.,* 911 F.2d 1447, 1454 (10th Cir.1990).

The difficulty with deciding this issue is primarily due to the manner of how it has evolved in the parties' briefs. The defendant's original brief sought summary judgment on the mere force of the general rule that an implied contract cannot coexist with an express contract. The plaintiff responded with the exception that an express agreement can be modified by implication. Since the defendant had not challenged the factual support for this exception, the plaintiff made no attempt to set forth the rules for modification or to identify the material issues of fact thereunder. In reply, defendant concedes this exception and says, "but so what?" Defendant then goes on to identify the general rules from Cali-

fornia and Washington of not implying an employment contract where an express agreement is present. Plaintiff's surresponse distinguishes the decisions from California and Washington on their facts. Pointing to the absence of an integration clause in the 1963 agreement, plaintiff further argues that the oral representations of defendant's agents and the supervisors' manual form the basis of his modification by implication theory. In its reply to plaintiff's surresponse, defendant contends for the first time that the plaintiff is unable to present the facts necessary to sustain his claim of modification.

Though the facts cited by plaintiff in support of his theory presents an appropriate target for summary judgment, the court finds that the defendant failed to present a proper and timely attack. Consequently, the court will deny the defendant's motion for summary judgment on the implied contract claim to the extent that the plaintiff may presently pursue the claim on the theory that the written agreement was modified by implication.

IT IS THEREFORE ORDERED that the defendant's motion for partial summary judgment (Dk. 52) is granted as to plaintiff's promissory fraud claim and is denied as to plaintiff's implied contract claim.