**WILLIAMS**

v.

**UNIVERSITY OF CINCINNATI.**

Court of Claims of Ohio.

No. 98–05031.

Decided June 4, 2001.

38

*Anne M. Frayne, Jacob A. Myers* and *Tina Fletcher Woods,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *William C. Becker,* Assistant Attorney General, for defendant.

FRED J. SHOEMAKER, Judge.

On April 16, 1996, plaintiff, Charles Williams, signed a National Letter of Intent ("NLI") as a prospect to enroll at the University of Cincinnati ("UC") and to play basketball. Prior to signing the NLI, plaintiff had signed a four-page

document that specifically stated his rights and responsibilities under the NLI. As required, the NLI was also signed by a parent of plaintiff and by the director of athletics at UC. The express terms of this NLI obligated UC to provide a scholarship to Williams, providing he was academically eligible to enroll as a full-time student at UC. The NLI would become null and void if plaintiff did not graduate from junior college. He was expected to graduate from Chaffey Junior College ("Chaffey") in the summer of 1996.

In the summer of 1996, plaintiff took three courses from other universities in order to obtain additional credits necessary for graduation from Chaffey in August 1996. At Compton Junior College ("Compton") he dropped a math class but passed reading and composition. He also took Introductory Elementary Algebra at Los Angeles Trade Technology Junior College ("L.A. Trade Tech") from May 27, 1996 through August 17, 1996. On or about August 8, 1996, plaintiff became aware that he would receive a grade of "D" in that course, meaning that the credits would not transfer to Chaffey. Obviously, at this point, plaintiff was not academically eligible to play basketball for UC in the 1996–1997 basketball season. Plaintiff previously had dropped out of high school, and subsequently earned a GED. Now plaintiff created more problems for himself and UC by not earning the necessary summer credits at the junior colleges.

Coach George Tarkanian, basketball coach at Compton, and Assistant UC Coach John Loyer, with plaintiff's knowledge and consent, immediately tried to help plaintiff earn credits at UC even though the final summer term had already begun. Plaintiff enrolled in Introduction to Physical Geography, Physical Geography Lab, and Business Computer Applications during the third summer session from August 5 through 27. The Physical Geography Lab met from 9:40 a.m. to 12:30 p.m., while the Business Computer Applications course met from 9:40 a.m. to 11:30 a.m. Monday through Friday. Because the overlapping schedule would result in plaintiff's missing at least one-third of his class time, some basketball staff members took notes and personally contacted the professors of these classes. Furthermore, Coach Loyer requested that the professors accept written reports for extra credit for both classes. The lab professor accepted written reports; however, the business computer professor refused. Plaintiff wanted to qualify for the 1996–1997 basketball season and Coach Loyer tried to help. Coach Tarkanian provided the money for the classes and for airfare from California to Cincinnati. Coach Loyer made arrangements for plaintiff's enrollment.

Despite his academic background and lack of attendance at the physical geography and physical geography lab, plaintiff obtained sufficient grades in these courses to qualify for credit at Chaffey. However, plaintiff received an "F" in the Business Computer Applications course. Therefore, plaintiff again failed

to qualify academically to graduate from Chaffey. Again, Coach Tarkanian and Coach Loyer tried to help plaintiff by paying fees and finding a professor who was willing to teach a math course on a "one-to-one" basis. In late August 1996, plaintiff received permission for his late enrollment in Introduction to Algebra, a mathematics course taught by Bill Swisher, a professor based at Clermont College of UC. Swisher authorized plaintiff's enrollment on August 28, even though plaintiff's formal enrollment did not occur until September 5, seven days after the end of the ten-week summer term (June 10 through August 29). To accomplish this arrangement, Swisher enrolled plaintiff just a day before the end of the term and issued plaintiff a grade of "incomplete." Swisher then taught the course to plaintiff daily in one-to-one sessions for approximately thirteen days. Plaintiff received a "B" grade for the course. Therefore, plaintiff graduated from Chaffey and became eligible to play basketball for UC in the fall of 1996.

On January 28, 1997, the National Collegiate Athletic Association ("NCAA") sent a letter of inquiry to the UC athletic director questioning plaintiff's academic eligibility. The letter reads as follows:

"The NCAA enforcement staff is currently reviewing the large quantity of credit hours earned during summer sessions by several prospective and, in some cases, enrolled student-athletes at Compton Community College (Compton, California).

"The available information indicates that some student-athletes did not perform appropriate academic work for some courses but received credit for the courses. Based upon the information, it appears that men's basketball student-athlete Charles Williams was enrolled at Compton during the summer of 1996 and earned an undisclosed number of hours. The staff is aware that Williams attended Chaffey Junior College through the spring of 1996 and would like more complete information concerning the young man's academic record while enrolled in junior college."

As a result of the letter, representatives of UC interviewed plaintiff and many other persons. Plaintiff admitted he took two courses at Compton, even though he was formally enrolled at Chaffey, that he enrolled in a math class at Compton, that he dropped the class because it was held too early (8:00 a.m.),[1] and that he passed his reading and composition course at Compton.

UC had a concern that plaintiff may have been academically ineligible to play basketball under NCAA rules. The consequences of playing an academically ineligible player are very serious to UC and to other student-athletes. The NCAA could forfeit games, suspend UC from tournament competition, and cause

---

1. It was really a marketing class—not a math class.

bad publicity and loss of television revenues. UC, therefore, suspended plaintiff from the last three games of the regular season and from any post-season tournament games.

UC retained the law firm of Bond, Schoeneck and King out of Kansas City, Missouri, to investigate whether there were NCAA rule violations with regard to the UC's men's basketball program. The investigation not only was quite lengthy but it also involved other student-athletes. UC was granted an extension for filing the self-report as required by NCAA rules. The self-report was filed on October 16, 1997. From January 1997 until October 16, 1997, UC provided periodic verbal reports to the NCAA enforcement staff; and, when appropriate, an enforcement staff representative would participate. The October 16 report consisted of sixty-six pages, plus exhibits, and accurately reflected evidence that UC had obtained at that time. UC advised the NCAA of the following corrective measures:

"IV. Corrective Measures

"The University of Cincinnati recognizes that the foregoing violations are serious matters that require corrective action. In examining these violations, it has been determined that each is related to men's basketball prospective student-athletes arriving and residing in Cincinnati, Ohio, during the summer prior to their initial full-time enrollment at the University. To address the institution's vulnerability to potential violations arising from these situations, the athletics department has developed additional policies to improve internal communication and to enhance its ability to monitor compliance with NCAA rules in this area.

"The University concludes the absence of appropriate administrative control over and within the men's basketball program created an atmosphere where violations of the type reported could and did occur. For example, basketball program personnel have attempted to perform services for student-athletes that go beyond coaching and should have been performed, if at all, by academic advising or other personnel in the central athletics department office. There also has been a failure to institute a clear policy prohibiting coaching staff from initiating contact with University faculty. Additionally, procedures related to the monitoring of summer employment and the benefits related to on-campus summer employment of men's basketball student-athletes must be strengthened. Robert Goin, the new director of athletics, has taken firm control of the department and intends to assure that future activities in these areas are centrally administered and carefully monitored. Consistent with the mission of the NCAA enforcement program, as articulated in Bylaw 10.01.1, which is to eliminate violations of the NCAA rules should violations occur, the University of Cincinnati, under the direction of President Steger, has taken the following actions:

"1.   All coaches have been advised of a new policy whereby each head coach must provide written notification and obtain the written approval of the athletics director, the director of compliance and the head of the academic services unit for student-athletes before a prospect recruited by that coach (or by one of his or her assistant coaches) is permitted to arrive and/or reside in Cincinnati prior to the prospect's initial enrollment as a full-time student at UC.   * * *

"2.   The academic advising and support program for the men's basketball student-athletes has been relocated from the basketball office area to the central athletics department offices where these functions are administered for student-athletes in all other sports at the University.   All academic advising and support services for men's basketball student-athletes will be provided by these central athletics department offices.   In particular, men's basketball coaching staff members have been specifically notified by Mr. Goin that they may not provide any such academic advising and support services.

"3.   The athletics department policy prohibiting coaching staff from initiating contact with faculty members concerning the academic status of a student-athlete has been included in written form in the athletics department's Policies and Procedures Manual and has been communicated in writing to all athletics department staff members and coaches.   Additionally, procedures related to academic issues, tutors, book room, summer school courses, independent study courses, housing and financial aid have been reemphasized verbally and in writing by the director of athletics.   * * *

"4.   The athletics department will circulate an annual newsletter to faculty describing athletics department policies and NCAA legislation as it relates to the academic activities of student-athletes.

"5.   Each member of the men's basketball coaching staff will be required to attend an NCAA regional compliance seminar during the 1997–98 academic year.

"6.   On March 31, 1997, assistant coach John Loyer was placed on leave pending further investigation and was instructed not to participate directly or indirectly in the operations of the men's basketball program, including the recruitment of prospective student-athletes and contact with enrolled student-athletes.   He will remain in this status until the NCAA enforcement staff and/or the NCAA Committee on Infractions have completed their review of the matters involving coach Loyer.

"7.   The University has permanently disassociated manager Tom Oakes from further involvement with the University's athletics program in general, and the men's basketball program in particular.   * * *"

The basic position of the NCAA is that no extra benefits shall be given to any student-athlete except as set forth in the NLI. The applicable NCAA regulation provides:

"NCAA Bylaw 16.02.3—Extra Benefit. An extra benefit is any special arrangement by an institutional employee or a representative of the institution's athletics interests to provide a student-athlete or the student-athlete's relative or friend a benefit not expressly authorized by NCAA legislation. Receipt of a benefit by student-athletes or their relatives or friends is not a violation of NCAA legislation if it is demonstrated that the same benefit is generally available to the institution's students or their relatives or friends or to a particular segment of the student body (*e.g.*, foreign students, minority students) determined on a basis unrelated to athletics ability."

It is clear to the court that plaintiff would not have been eligible for the 1996–1997 basketball season if Swisher had not taught him "one-to-one" in a special class. Plaintiff furnished Swisher with basketball tickets for many games, and they became good friends. Neither plaintiff nor Swisher realized, at the time, that under the above-cited bylaw Swisher technically became a representative of UC's athletic interests when he became involved with plaintiff's recruitment.

Therefore, under the regulation, the following post-recruitment occurrences qualify as extra benefits for plaintiff:

1. During November 1996, Swisher transported plaintiff and provided a ticket for him to attend a Cincinnati Bengals professional football game;

2. On one occasion during the fall of 1996, Swisher transported plaintiff and purchased a meal for him at Buffalo Wings and Things restaurant in Cincinnati;

3. During 1996, Swisher purchased a round-trip airline ticket for plaintiff to travel between Cincinnati and Los Angeles on December 21 and 25, 1996.

There was also a violation of NCAA Bylaw 13.6.1, when, on one occasion during the summer of 1996, Coach Loyer provided impermissible automobile transportation from L.A. Trade Tech to plaintiff's home in Inglewood, California. Plaintiff, at the request of Coach Loyer, at first denied this allegation, but later admitted it. The applicable NCAA Legislation provides:

"Bylaw 13.6.1—Transportation—General Restrictions. An institution may not provide transportation to a prospect other than on the official paid visit or, on an unofficial visit, to view a practice or competition site and other institutional facilities (located within a 30–mile radius of the institution's campus) when accompanied by an institutional staff member. * * *"

On August 4, 1997, the UC Director of Compliance, Heather R. Lyke, wrote a letter to the NCAA regarding plaintiff, which provides:

"The purpose of this letter is to advise you that while violations of NCAA recruiting and extra-benefit legislation appear to have occurred, the university does not believe that Charles knowingly was involved or intentionally violated NCAA legislation. Further, the university was aided in its investigation by Charles'[s] cooperation."

On October 22, 1997, Director Lyke again wrote a letter to the NCAA regarding plaintiff, requesting restoration of his eligibility and stating:

"Enclosed is a report notifying you that a student-athlete at the University of Cincinnati has inadvertently violated NCAA Bylaws. The institution regrets that these violations occurred and has taken positive steps to ensure future compliance with all NCAA rules. Please note that the violations have resulted in our declaring Charles Williams ineligible to compete for our men's basketball team. *The University of Cincinnati requests restoration of his eligibility. If it is possible for your staff to review this report as soon as possible, we would sincerely appreciate that effort.*" (Emphasis added.)

On October 29, 1997, the relevant NCAA committee responded to the university, stating:

"NCAA Reinstatement Action: Eligibility restored after the student-athlete is withheld from all but the last six regularly scheduled contests during the 1997–98 season. In its review, the student-athlete reinstatement staff was unable to conclude that the young man enrolled at Cincinnati as a direct result of the recruiting inducements described above, in that the young man had signed a National Letter of Intent with the institution in April 1996 and the recruiting inducements occurred in July and August 1996. However, the staff believed that the actions of the institution in permitting the student-athlete to enroll in a math course on the final date of the course, to receive private sessions with the professor of that course and the receipt of a 'B' grade for the course, resulted in Williams being immediately eligible to participate at Cincinnati. But for the special arrangements involving this math course, it is likely the young man would not have graduated from his junior college and as a result, would not have been academically eligible to compete during the 1996–97 season. Since the young man competed in all of the 1996–97 season, with the exception of the last six contests when he was declared ineligible, the staff concluded that the condition should be reflective of what the young man, most likely, gained improperly (the entire 1996–97 season except for the last six contests). Therefore, the staff believed it was appropriate for the institution to withhold the young man from the majority of the 1997–98 season, but permitting him to participate in the final six regular season contests.

"NCAA Enforcement Action: This matter has been forwarded to the NCAA enforcement staff for further review."

After UC filed its self-report related to violations of NCAA rules, the NCAA responded on May 5, 1998, with multiple inquiries. UC responded to those inquiries on June 29, 1998. Eventually, a formal hearing was held before the NCAA in Seattle, Washington. The NCAA issued a final ruling that virtually mirrored the findings and conclusions of the committee as set forth in the letter of October 29, 1997. In short, plaintiff regained eligibility for the last six games of the 1997–1998 basketball season at UC as well as USA Conference and NCAA championship games.

Even though plaintiff remained on scholarship throughout the NCAA proceedings, plaintiff dropped out of UC in December 1997, before completing his classes for the fall quarter and before his eligibility was restored.

Ultimately, plaintiff enrolled in the University of California at Bakersfield, a Division II school, on a full scholarship. After five games, plaintiff developed problems involving a prior injury. Although he returned to play five more games, he voluntarily quit the team and dropped out of school. Currently he is assisting Coach Tarkanian at Compton.

## Breach of Written Contract Claim

The NLI, by its express terms, both commits a student-athlete to attend a particular college or university and commits that college or university to provide the student-athlete with a scholarship for at least one year. UC never rescinded plaintiff's scholarship. The NCAA, not UC, determined that plaintiff would be ineligible for one basketball season. The NCAA is not a party in this case.

The major concern in this case is that plaintiff was obliged to become academically eligible in order to be admitted to the fall quarter of 1996 at UC. Plaintiff was expected to graduate from Chaffey in the summer of 1996, but he failed to meet that obligation. Coach Tarkanian of Compton and members of the UC basketball staff, with plaintiff's consent, tried to remedy the situation by acquiring eligibility for plaintiff for the 1996–1997 basketball season. Plaintiff received unusual financial support from Coach Tarkanian and unusual academic support by Professor Bill Swisher and others. Without such support, plaintiff would not have been academically eligible to participate in the 1996–1997 basketball season. In addition, plaintiff added to his problems by failing courses at junior college and again at UC.

As stated earlier, it was the inquiry from the NCAA that caused the investigation of plaintiff and other student-athletes in the UC basketball program. UC was required to promptly investigate recruiting policies in place at UC in general and recruiting of plaintiff in particular. UC wanted plaintiff's eligibility to be restored for the 1997–1998 basketball season. However, as a member of the NCAA, UC had no authority to reverse the NCAA decision. UC consistently

maintained that Swisher did not violate any UC policy by teaching the one-to-one algebra course in early September 1996. The NCAA made the "inquiry" and made the final judgment on the penalty regarding plaintiff.

The basic purpose of the NLI is to formally recognize a student-athlete's intent to attend UC. The primary obligation imposed upon plaintiff was to graduate from a junior college and attend UC for at least one year. The primary obligation imposed upon UC was to provide plaintiff with "an award for athletics financial aid" for one year.

Quite frankly, it was plaintiff who breached the terms of the NLI by his poor academic performance. UC never rescinded his scholarship. In *Lesser v. Neosho County Community College* (D. Kan. 1990), 741 F.Supp. 854, 865, the court stated:

"In their summary judgment motion, defendants argue that based on *Hysaw v. Washburn Univ.*, 690 F.Supp. 940 (D.Kan.1987), plaintiff's breach of contract claim must fail. Defendants argue that the letter of intent in no way promised plaintiff that he would be allowed to play baseball, but instead only promised him a scholarship. There is no dispute that defendants did provide a scholarship.

"The law of Kansas is well established that clear and unambiguous language in a written contract is controlling. *Fast v. Kahan*, 206 Kan. 682, 684, 481 P.2d 958, 961 (1971). This judge reviewed a very similar contract claim in the *Hysaw* case. In *Hysaw*, this court found that the *letter of intent in that case only promised that the players would receive a scholarship and did not promise a position on the Washburn football team. Hysaw*, 690 F.Supp. at 946–47." (Emphasis added.)

The financial aid agreements between UC and plaintiff constitute valid contracts. UC performed all obligations imposed by the financial aid agreements. See *Taylor v. Wake Forest Univ.* (1972), 16 N.C.App. 117, 121, 191 S.E.2d 379, 382. UC cannot control the actions taken by the NCAA regarding plaintiff's request for restoration of his eligibility to play basketball for UC. Contrary to UC's position, the NCAA treated the Swisher one-to-one course as an extra benefit. Without this course, plaintiff would not have been eligible for the 1996–1997 season. Therefore, he would not have been entitled to a free college education.

Based on the totality of the evidence, plaintiff has failed to prove his breach-of-contract claim by a preponderance of the evidence.

## Defamation Claim

Plaintiff's counsel argued in closing that UC found sixteen different ways, in their report to the NCAA, to call plaintiff a liar. Plaintiff did not identify or

prove what these were. However, it is clear that the one way that UC could have used to defame plaintiff, namely calling him a liar, was never used in any report to the NCAA. In fact, UC reported to the NCAA that plaintiff's violations of NCAA rules were inadvertent and that for the most part he was cooperative and forthcoming in the university's investigation.

"Defamation" is defined as the unprivileged publication of a false and defamatory matter about another. It is a publication which "tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame or disgrace or affects him adversely in his trade or business." *McCartney v. Oblates of St. Francis deSales* (1992), 80 Ohio App.3d 345, 353, 609 N.E.2d 216, 222. In Ohio, " 'truth is a complete defense to a claim for defamation.' " *Sethi v. WFMJ Television, Inc.* (1999), 134 Ohio App.3d 796, 806, 732 N.E.2d 451, 458, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank* (1996), 75 Ohio St.3d 433, 445, 662 N.E.2d 1074, 1083.

Upon review of plaintiff's own testimony, the court finds that plaintiff did not tell the truth in his first interview with UC. Plaintiff was asked directly and simply whether he had ever taken any rides from any coaches. He said no. The truth was that he had taken a ride from Coach Loyer. It is also true that after plaintiff's mother encouraged him to tell the truth, plaintiff requested another interview to report that he had, in fact, accepted a ride from Loyer.

Plaintiff also claims that he was defamed when UC reported to the NCAA that he asked for a second interview to "correct some information" when the transcript from that interview indicates that he wanted to "clear some things up for the record." Such hair-splitting cannot possibly rise to the level of defamation.

Plaintiff further argues that it was defamatory for UC to report to the NCAA that there were "discrepancies" between what plaintiff said in his first interview and his school records. As Heather Lyke testified, this was also true. The discrepancy was that plaintiff reported that he had completed· a five-week algebra course when his school records demonstrated that he was enrolled on the last day of class. Thus, the statement was not false.

Moreover, even if plaintiff could prove that defendant made false and defamatory statements about him and that he sustained actual damages, defendant is protected from liability by qualified privilege. A publication is protected by a qualified privilege when the defendant making the communication is doing so under the performance of a public or private duty, or where the publisher and the recipient have a common interest. *Hahn v. Kotten* (1975), 43 Ohio St.2d 237, 243–244, 72 O.O.2d 134, 138, 331 N.E.2d 713, 718. UC clearly had a duty to report to the NCAA after the NCAA initiated the inquiry of plaintiff's academic

eligibility. Consequently, the court finds that the defamatory communication, if any, was privileged.

In order to defeat a qualified privilege, plaintiff must establish actual malice by clear and convincing evidence. *Bartlett v. Daniel Drake Mem. Hosp.* (1991), 75 Ohio App.3d 334, 340, 599 N.E.2d 403, 407. "Actual malice" means " 'acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.' " *A & B–Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council* (1995), 73 Ohio St.3d 1, 11–12, 651 N.E.2d 1283, 1292, quoting from *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 573 N.E.2d 609, paragraph two of the syllabus. Lack of innocent motive is not enough to establish actual malice. *A & B–Abell,* 73 Ohio St.3d at 11, 651 N.E.2d at 1292. "Reckless disregard" is shown by presenting "sufficient evidence to permit a finding that the defendant had serious doubts as to the truth of his publication." *Id.,* 73 Ohio St.3d at 12, 651 N.E.2d at 1293. " 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " *Id.,* 73 Ohio St.3d at 13, 651 N.E.2d at 1294, quoting *St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267. In this case, plaintiff completely failed to prove malice on the part of defendant.

With regard to the UC press release of June 6, 1998, the court finds that UC was simply summarizing what it had reported in the "self-report" to the NCAA. Plaintiff contends that UC falsely accused him of having papers typed at no cost or low cost. However, the court finds that it is reasonable to interpret the language of the press release as making those representations about players other than plaintiff. Plaintiff was specifically identified as the player who received "improper academic assistance." Under the "innocent construction rule," where a statement is susceptible of a defamatory meaning and a nondefamatory meaning, the nondefamatory meaning should be adopted. *Sethi,* 134 Ohio App.3d at 808, 732 N.E.2d at 459–460.

In short, based on the totality of the evidence, the court finds that plaintiff has failed to prove his defamation claim.

## Oral Contract/Promissory Estoppel

Plaintiff argues that UC failed to do everything it could have done in terms of investigating plaintiff's alleged violation of NCAA rules. Plaintiff also contends that the investigation should have been completed sooner. Plaintiff claims that UC had an obligation to thoroughly instruct him in every aspect of the NCAA rules and that he lost his eligibility because he relied to his detriment upon Coach Loyer's advice.

In response to both claims, the court finds that plaintiff's·problems result from his academic failures at Compton, L.A. Trade Tech, and UC, despite receiving financial aid from Coach Tarkanian and other assistance from the UC basketball staff. The NCAA, not UC, determined plaintiff's loss of basketball eligibility. Moreover, plaintiff could have continued on scholarship at UC, played basketball for part of the 1997–1998 season, and obtained a college degree. However, he voluntarily quit school. In the view of the court, plaintiff lost his eligibility because of his own failures, not because of any breach of contract by UC or any unfulfilled promises.

Based on the totality of the evidence, the court finds that plaintiff has failed to prove his breach-of-an-oral-contract and promissory-estoppel claims by a preponderance of the evidence.

### Intentional Infliction of Emotional Distress

In order to recover on his claim for intentional infliction of emotional distress, plaintiff must allege and prove:

1. That the actor either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to plaintiff;

2. That the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency, and that it can be considered as utterly intolerable in a civilized community;

3. That the actor's actions were the proximate cause of plaintiff's psychic injury; and

4. That the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374–375, 6 OBR 421, 426, 453 N.E.2d 666, 671.

"Liability for intentional infliction of emotional distress 'does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities.'" *Simonelli v. Anderson Concrete Co.* (1994), 99 Ohio App.3d 254, 261, 650 N.E.2d 488, 493, quoting *Yeager,* 6 Ohio St.3d at 375, 6 OBR at 426, 453 N.E.2d at 671.

Plaintiff's claim is based largely upon the fact that he was asked to leave the team bus, just before departure for a game at Marquette, because of the NCAA inquiry. Although the timing of the decision was unfortunate and it understandably caused plaintiff some distress, there may have been more serious consequences to UC and plaintiff if plaintiff had been permitted to participate in the basketball program after receiving the NCAA inquiry. The court will not, or should not, substitute its judgment on this issue. Under the circumstances,

defendant's conduct was justifiable and in no way amounted to extreme and outrageous conduct.

## Conspiracy

In order to establish a claim for conspiracy, plaintiff must prove an underlying wrong that could only have been committed by two or more people. " 'Civil conspiracy' has been defined as a 'malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.' " *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, 866, quoting *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640, 645.

Plaintiff's mere allegation of a conspiracy does not state a claim for relief. "Conspiracy allegations add nothing further to a plaintiff's action other than the underlying wrongdoing that is the basis of the conspiracy." *Palmer v. Westmeyer* (1988), 48 Ohio App.3d 296, 300, 549 N.E.2d 1202, 1207. An underlying wrongful act is required before a civil conspiracy claim can be successful. *Minarik v. Nagy* (1963), 8 Ohio App.2d 194, 195, 26 O.O.2d 359, 360, 193 N.E.2d 280, 281. (" '[A] conspiracy cannot be made the subject of a civil action unless something is done which, without the conspiracy, would give a right of action.' ").

The only argument plaintiff advanced for this allegation was that UC asked for and received an extension of time from the NCAA to complete its investigation. This is the same investigation that took place, for the most part, in the off-season. Moreover, as set forth above, no underlying wrong was committed. Plaintiff failed to prove his conspiracy claim by a preponderance of the evidence.

In conclusion, plaintiff has failed to prove any of his claims by a preponderance of the evidence. Therefore judgment will be rendered for defendant.

*Judgment for defendant.*

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.